MURRAY, Acting P. J.
*587 Defendant was found guilty of all counts in a 33-count information. Thirty-one of the counts charged defendant with sex offenses against one of his daughters and two other victims, each of whom was 16 years old or younger at the time of the offenses. In the other two counts defendant was convicted of furnishing a controlled substance to the daughter. At trial, two additional victims testified to uncharged acts of child molestation and sexual misconduct pursuant to Evidence Code section 1108.[1] The trial court sentenced defendant to 46 years four months in prison.
On appeal, defendant asserts that: (1) the trial court abused its discretion in admitting the evidence of prior sex offenses pursuant to section 1108, and any forfeiture of that contention constituted ineffective assistance of counsel; (2) instructing the jury with CALCRIM No. 1191 allowed *530 the jury to infer his guilt based on mere propensity proved by only a preponderance of the evidence, confusing and misleading the jurors on the burden of proof and conflicting with the circumstantial evidence instruction, and any forfeiture of these contentions constituted ineffective assistance of counsel; (3) the trial court abused its discretion in admitting expert witness evidence of child sexual abuse accommodation syndrome (CSAAS), and any forfeiture of that contention constituted ineffective assistance of counsel; (4) the trial court erred in instructing the jury with CALCRIM No. 1193 because that instruction permitted the jury to use the CSAAS evidence to evaluate the believability of the victims' testimony, reducing the prosecution's burden of proof; (5) he sustained prejudice as a result of cumulative trial error; and (6) the trial court failed to exercise its discretion, and abused that discretion, in imposing consecutive sentences on counts one and two.
In the published portion of this decision (Discussion parts I.A. & I.E.3.) we reject defendant's due process contentions and in doing so, we conclude that reliance upon McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378 ( McKinney ) is misplaced because that case has no application in the context of section 1108 evidence. We also reject defendant's contention that CALCRIM No. 1191 concerning uncharged acts of sexual misconduct[2] and the circumstantial evidence instructions conflict and reduce the burden of proof. (Part II. of the Discussion.) Our high court's reasoning in cases involving a later version of the uncharged sexual misconduct instruction and instructions pertaining to section 1101, subdivision (b), compels rejection of defendant's argument. Furthermore, the wording of CALCRIM No. 1191 makes it clear that the reasonable doubt standard applies to the charged offenses.
*588 We vacate the sentences imposed on counts one and two and remand the matter for resentencing on those counts, at which the trial court shall choose whether to impose consecutive or concurrent sentences and articulate the reasons for its choices. We also direct the trial court at resentencing to clearly impose a court operations assessment and a criminal conviction assessment on all 33 counts. We otherwise affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The Prosecution's Case-in-chief
J. Doe[3] (Counts One & Two)[4]
J. was 32 years old at the time of her trial testimony. R., formerly defendant's wife, was J.'s cousin.
J. recalled a time when she was 14 years old when she visited defendant and R. in Sacramento and defendant took J. and P. to a park and gave them alcohol. Defendant also made advances at both J. and P. When it was time to leave the park, J. and P. did not want to go in the house with defendant so they slept in the car in the driveway.
*531 There were also occasions when J. saw defendant in the Bay Area. On one occasion, J. was at her grandmother's house in Richmond and defendant was there. J. woke up and went into the living room where she saw defendant. Defendant passed J. a letter in which he told her that he had a dream about her. Later that day, defendant repeatedly called for J. at her grandmother's house, but J. told her grandmother to tell him that she was not there. J. was scared, and she called P. and asked her to come over, which P. did. Later, defendant came to the house and he and P. went to the store together.
On another occasion, J. was in the ninth grade and she was called into the office at school. There, she found that there were flowers and balloons for her from defendant. J. threw them away. When J. got home later that day, her mother asked her where the flowers and balloons were. When J. asked her mother how she knew about them, J.'s mother responded that defendant "said he wanted to do something nice for you because you were feeling down." (Italics omitted.)
*589 On another occasion, still when J. was 14, she visited R. and defendant for the summer. One day, R. went to work and J. took a shower. After taking a shower, J., wearing only a towel, went into a bedroom and closed the door. Defendant entered the room, started touching J., and tried to take her towel off. J. told defendant to stop, but defendant reassured her that he was not going to hurt her. Defendant eventually got J.'s towel off, laid her on the bed, touched her breasts, opened her legs, caressed her vagina, and performed oral sex on her. Defendant also inserted two fingers in J.'s vagina. He also attempted to place his penis in J.'s vagina. J. said no. Defendant's penis pushed against J.'s vagina "but it wouldn't go and then [J.] told [defendant] that [she] wasn't ready and then he stopped." Defendant then left the room.
J. acknowledged that she did not disclose the incident to adults or to law enforcement. She felt like it was a difficult situation, particularly because defendant and R., who was J.'s cousin, had been together so long. J. felt guilty. J. eventually decided to disclose what had happened in 2012, after she learned that Ja., defendant's daughter, had reported incidents to law enforcement. After that, J. spoke to R., told her what had happened, and R. told J. that she should contact law enforcement.
L. Doe (Counts Three & Four)[5]
L. was 25 years old at the time of trial. She testified that defendant dated her sister, S. Defendant was still married, but he had told S. that he and his wife were separated.
L. visited S. in August 2005. While they were all in a car together, defendant said something to S. about a threesome. Defendant asked L. if she would ever have a threesome with him and S. Later in the day, at S.'s apartment, defendant offered L., who was 15 years old at the time, a Long Island Iced Tea. Defendant told L. multiple times that she was sexy. Looking through a catalog, defendant pointed out some lingerie and told L. that she would look sexy in it. L. was feeling uncomfortable, and she just kept brushing defendant off.
L. stayed that night in S.'s apartment. Defendant touched L. inappropriately on more than one occasion that night. On the *532 first occasion, L. was sitting on the couch under a blanket playing with S.'s nine- or ten-month-old son.[6] Defendant picked up the baby and, when he did so, he picked up the *590 blanket as well. As defendant lifted the baby with one hand, he rubbed L.'s vagina over her pajama bottoms with the other hand.
Later, defendant and S. were playing around and locking each other out of the apartment. At one point, when he locked S. out, defendant approached L. on the couch, rubbed her vaginal area over her clothing for about a minute, and tried to kiss her. Defendant said to L., " 'We're doing this. We're going to do this.' " He then went to unlock the door for S.
Defendant left the apartment, but, after he left, he called L. more than three times and sent her text messages. L. did not answer the calls. In the text messages, defendant told L., " 'We're fucking tonight,' " and " 'Don't be scared.' "
By the time defendant returned to the apartment, in the middle of the night or in the early morning, L. was asleep on the couch. Defendant knocked, but lightly enough so that S. would not hear. L. did not do anything, thinking that defendant might just go away. Defendant knocked harder, and then called S., who let him in. S. and defendant went into S.'s room, but defendant returned to the living room an hour or two later, after S. went to sleep. L. was on the couch, pretending to be asleep. Defendant approached the couch and touched L. under the blanket. Defendant pulled L.'s pajama bottoms down, tugged on L.'s underwear, ripping them, and put two fingers in her vagina. Defendant moved his fingers in and out. L. just lay there, not knowing what to do. L. told defendant not to touch her, but she acknowledged at trial that she did not know if she said it loudly enough, "or if it was in a joking way. I wasn't really aggressive telling him to stop." She felt embarrassed. After a few minutes, S. came into the room, and defendant dove onto the floor and pretended that he had just been lying there. Defendant then got up and went to the patio with S., had a conversation, and then went into the bathroom. Defendant left the apartment and S. went back to sleep. L. just lay there, not knowing what to do.
The next morning, L. called her mother to pick her up and told her what had happened. L. and her mother went to her mother's house, where her mother called the police. Deputy Sheriff Gustavus Youngberg came to the house and took a statement from L. L. told Youngberg that defendant touched her vagina area three times. L. showed the deputy her phone with the text messages and call log. There were five missed calls on the phone. Defendant had texted L., "ur fucking tonite. Rite me! Don't be scared!" A second text read, "ur fucking tonite. Write me! She is going to sleep. Call." A third text message was the same as the first text message. The last text message said, "I'm coming."
*591 L.'s mother then took L. for a medical examination. She saw Sheridan Miyamoto, a forensic nurse practitioner who worked at the Child and Adolescent Abuse Resource and Evaluation Center at U.C. Davis.[7] Miyamoto saw children brought in due to concerns of physical and sexual abuse or neglect. Miyamoto performed an examination of L. on August 17, 2005. As she began the examination, Miyamoto noticed that L.'s underwear was torn. L. said *533 that her sister's boyfriend had put his hand in her underwear, and her underwear tore. During the genital examination, an area of L.'s left labia majora "fluoresced," indicating the possible presence of a substance that could contain DNA. After the examination, Miyamoto concluded that the results were consistent with L.'s description of the alleged assault. Miyamoto noted that, in cases of digital penetration, it is "not at all uncommon" for there to be no physical injuries. She further noted that, based on a substance fluorescing, "not knowing what those are, I also mark as something that is-potentially contributes and would be consistent."
Miyamoto collected evidence via swab from the area that fluoresced, labeled it, and placed it in the crime kit. Ann Murphy, a criminalist at the Sacramento County Laboratory of Forensic Services, compared the foreign material swab from L.'s crime kit, which was a partial profile, with a reference sample from defendant and found that the DNA profiles were consistent. The likelihood of a random individual's DNA profile matching the partial profile Murphy analyzed was one in 250 million in the African-American population, one in three billion in the Caucasian population, and one in 15 billion in the Hispanic population.
When Detective Jason Jacobo of the Elk Grove Police Department contacted L. in 2012 about the investigation, she did not want to be involved. Ultimately, L. did talk to two female criminal investigators from the district attorney's office.
Ja. Doe (Counts Five through Thirty-Three)[8]
Ja. was defendant's daughter. She was 23 years old when she testified at trial.
When Ja. was nine years old, defendant began to come into her room, which she shared with her younger sister D., and kiss them both on the *592 mouth. Ja. testified that defendant would sometimes use his tongue when he kissed her on the mouth and his kisses could last five minutes. Defendant would also touch Ja. on her vaginal area, under her clothing, with his hand. Sometimes defendant would carry Ja. into his room when R. was not there and rub lotion on her without her clothes on. He would apply lotion to Ja.'s arms, legs, and then "he would move up more in between [her] legs with [her] vagina area." Defendant would "use his two fingers and he would rub along the vagina area slow." He would also rub Ja.'s breasts. Ja. estimated that this occurred 20 times. The last time defendant did this, Ja. ran to her room and locked the door.
On one occasion, still when Ja. was nine, defendant was playing with Ja. and D. and defendant's penis came out of his boxer shorts. He did not put it back in, but instead continued to play with the girls.
One day, still when Ja. was nine years old, R. called Ja. where she was staying "in the Bay Area at [her] nana['s] house," and asked Ja. if defendant ever touched her in a " 'wrong way.' " Ja. told R. that he did. When R. confronted defendant, he told Ja. to stop lying. He also suggested that Ja. had been dreaming. Ja. was scared and feared she was going to get in trouble. She *534 also did not want her parents to fight. Ja. was brought to "a children's place where [she] had to talk to somebody," and she told that person "that it didn't happen...." On cross-examination, Ja. testified that she remembered telling a social worker that defendant never touched her inappropriately, but testified that she did so only because she was scared. She did not want her parents to be mad at her.
The next time Ja. remembered something sexual happening with defendant was when she was 13 years old. She testified that defendant "took [her] virginity from [her]." R. was at work and defendant told Ja. to come to the room where he was. Defendant had video surveillance cameras throughout the home, and defendant was looking at a monitor to see if anyone was coming. Defendant closed the door, pulled down Ja.'s pants, and tried to put his finger in her "private area," but it would not fit. Defendant said, " 'Let me see something right quick. Let me check something out.' " Defendant told Ja. to lie down, which she did, and defendant pulled out his penis. Defendant inserted his penis inside of Ja., and she told him that it hurt. Defendant "kept going and going with it." While he was doing it, defendant kept looking at the video monitor. Defendant told Ja., " 'Just for a few more seconds. Just give me a second, for a few more seconds.' " Defendant then ejaculated onto his hand. Ja. estimated that the incident took 15 minutes. When it was over, Ja. was bleeding. She pulled up her pants and ran upstairs, wiped herself, and saw that there was "a lot of blood." She then heard defendant say, " 'Come on. Let's go. Let's go pick up your mom.' " When they picked R. up, R.
*593 immediately asked Ja. what was wrong. Ja. could see defendant looking at her in the rearview mirror. Ja. "just turned back around and looked out the window, continued to look out the window and didn't say anything after that."
On another occasion, when Ja. was still 13 years old, she awoke to defendant coming into the room she shared with D. Ja. saw defendant put a DVD on the television. Ja. went back to sleep. When she woke up, she saw that there was pornography playing on the television. By that time, defendant was no longer in the room. Ja. turned the television off and went back to sleep. Ja. woke up again later, saw that defendant was sitting on the edge of her bed, and saw the pornography back on the television. Defendant was rubbing Ja.'s vagina area under her clothing with his hand. Ja. got up, ran out of the room, and ran into R.'s room. R. said, " '[Ja.], what are you doing in here? Go to bed.' " Ja. did not tell R. what had happened, and instead went back to her room. Defendant had left her room. The next morning, Ja. told R. what had happened, that she did not like the way defendant touched her, and that she felt uncomfortable. R. again confronted defendant with what Ja. had said. Defendant claimed he did not know what she was talking about, and again suggested that Ja. had been dreaming. Nothing came of this disclosure either.
Ja. testified that, when she was 13, defendant had her give him oral sex, he gave her oral sex, and he had vaginal and anal intercourse with her. Defendant also penetrated Ja.'s vagina using his fingers and using other objects, including what Ja. believed to be a massager that was kept in her parents' dresser drawer. He would also kiss her and touch her breasts. Defendant would ejaculate on various places on Ja.'s body.
Using a Sony camera, defendant would take photographs and videos of Ja. while she was naked. He would record these images of her vagina and her breasts. Ja. testified: "He would tell me to open my legs, put my legs back, or he would tell me *535 to put my hands down at my private, my vagina area, and he would tell me to open up my vagina area with my hands so he can see the inside of my vagina." Defendant would also tell Ja. to play with herself for the video, and to go into the bathroom and record herself. Sometimes she would protest, but defendant would tell her that she could choose between recording herself or having sex, and she would choose recording herself. Defendant would also record sex acts he engaged in with Ja.
Defendant would text Ja. and tell her things like, " 'ten minutes come in the room,' " or he would tell Ja.'s siblings to go to bed and tell Ja. to come back downstairs in 20 minutes. When they were alone, defendant would tell Ja. to "make him hard," by which he meant that she should give him oral sex, *594 he would tell her to lie down and tell her, " 'We're going to do this,' " or he would tell her, " 'Suck me up for a little bit.' " It got to the point that Ja. knew what was going to happen when defendant told Ja. to meet him someplace. Ja. would just take her clothes off, knowing what was about to happen.
If Ja. told defendant she did not want to do something, he would get mad, take things away from her, tell her she could not go out, or "just have attitudes if [she] didn't do it." Ja. testified that defendant would give her gifts or tell her that, if she let him have sex or have oral sex, he would let her go to a friend's house or go out and do something. The gifts included necklaces, rings, and new phones. However, if Ja. did not do as defendant wanted, he would take the items away. When Ja. would come home after having her hair done, defendant would say, " 'You want to get on tonight?' " He would also use sex as a "reward" on her birthday and other special occasions. Defendant told Ja. that "all fathers do this with their daughters. That's just their father-daughter relationship. It's just how things go." He also told her that he had "done stuff to [Ja.'s] cousin and [her] brother," and " 'Yeah, I did that to them. It's normal, so then it should be okay for me to do this to you.' "
Defendant would also use sex as a punishment. On one occasion, defendant saw Ja. talking to a boy, which he did not like, and he was mean to Ja. all day. That night, while everyone else in the house was asleep, defendant had sex with Ja., during which he slapped her face and asked if she learned her lesson, if she was going to "do that again," and if she was sorry. On another occasion, when she did not let defendant have oral sex with her, he dropped her off at a friend's house, but immediately retrieved her and told her that he would not take her back unless she let him perform oral sex on her. Ja. ran upstairs crying, and defendant choked her. R. heard the commotion and asked what was going on. When Ja. said defendant had choked her, defendant, again, said she was lying. R. told Ja. that if she was talking back to defendant, she should stop. Later, defendant took Ja. to S.'s house, and, while S. was not there, he had sex with Ja.
Defendant would also tell Ja. that no one else would make her feel the way he did, and that he wanted to be the only person in her life making her feel the way he did.
Ja. also remembered an incident when she was 13 when defendant first gave her ecstasy. Defendant would give her marijuana, alcohol, cocaine, and ecstasy. Ja. testified, of these substances: "I felt-my body was tired. At times I would do it just so I wouldn't feel the pain just so I wouldn't feel nothing, and I would be so numb to where I'm not even in my body. I'm just laying there and just don't know, like, what's about to happen. Just blacking out. Just dropping to my knees and just doped up."
*536 *595 Ja. would tell defendant that she was going to tell R., to which he responded, " 'Well, you tell her, then she's not going to believe you,' or 'She's going to beat you up,' or 'You're going to get in trouble for it.' " Ja. wanted to tell R. "[a]ll the time," but she did not. She felt tired, she was losing weight, her hair was falling out, and she was not functioning in school. One day she looked in the mirror and she saw "this doped-up person that I would see on the streets somewhere or say, 'Oh, my God, look at that person. What happened to them? Why are they like that?' " She remembered one occasion when she went upstairs to tell R. what was happening. She went up the stairs towards the room where R. was, and she heard R. having a conversation with someone. The subject of the conversation was molestation in families, and Ja. overheard R. say that she prayed nothing would happen to her family and her daughter. Ja. "just stopped in front of the door, and ... went back downstairs."
Ja. testified that sexual activity occurred every night. However, she also testified that she thought the sexual activity occurred "more than 30 times" each year. She responded affirmatively when the prosecutor asked whether the forms of sexual activity she described, including performing oral sex, receiving oral sex, defendant's digital penetration of her vagina, and vaginal intercourse, occurred at least twice each year between the time she was 13 and when she was 17. She also testified that defendant provided her with cocaine and ecstasy each year when she was 15, 16, and 17. Defendant's sexual abuse of Ja. continued until she was 17 years old.
When Ja. was 17, on Christmas Eve, R. was on the phone, and, while she was on the phone, R. said something like, " 'If you don't tell what you done or somebody done to you, that's bad. You're going to go to hell,' " or "if you don't tell what happened to you, or if anybody doing anything to you, you're going to go to hell, you're going to burn up." Ja. thought to herself that she refused to go to hell because of defendant. She felt her body getting hot, and she went to the bathroom. R. followed Ja. to the bathroom and asked what was wrong. Ja. told R. that defendant was having sex with her.
Ja. decided to go to the police. R. told Ja., " 'If this is really what you want to do, then I'm here for you.' " However, defendant's mother, brother, and sister told Ja. not to tell anyone, and that defendant would be killed in prison.
Ja. went to the police. As Ja. got out of the car, defendant called her and said: " 'Don't tell on me. Don't say anything. Tell them that you had a boyfriend that you were with,' or ... 'Tell them that you were, again, dreaming and you thought that was me and it wasn't me and whatever.' " Ja. got scared, confused, and did not know what to say. She still wanted to protect defendant because, despite everything he had done, he was her father.
*596 Ja. "didn't go through with it." She told the detective that nothing happened. Again, on cross-examination, Ja. testified that she did not say anything because she was scared. However, defendant's sexual abuse of Ja. ended, and R. and the kids eventually lived apart from him. When she turned 20 years old, Ja. "finally had the courage and the strength to go tell."
P. Doe ( Section 1108 Witness)
P., J.'s cousin, testified pursuant to section 1108. She was 32 years old at the time of trial.
P. testified that, when she was 13 or 14 years old, she went to J.'s grandmother's house because J. called her and asked her to come over. P. went to the store with *537 defendant, defendant asked for her phone number, and P. gave it to him.
Some time later, perhaps months later, defendant called P. and suggested that they get together. Defendant suggested that he pick P. up on her way to school. On one occasion, defendant picked P. up and took her to a house in North Richmond. Defendant took P. into a room "and was kissing and stuff like that." Defendant also tried to put his fingers in P.'s vagina by unzipping her pants and putting his hand down her pants, and he may have touched her breasts. Defendant tried to take P.'s pants down, but he was not able to do so. They remained at the house for approximately two hours, and defendant then took P. to school.
On another occasion, defendant took P. to an abandoned house in Richmond. He took her into a room and kissed and touched her.
On yet another occasion, when P. was 13, she visited J. and R. P. wanted to take a shower, but she was holding D., who was a baby at the time, attempting to put D. to sleep. P. turned on the water, but D. was crying, so P. gave D. to J. and went back to the bathroom to shower. When she got back to the bathroom, she found defendant in the shower. P. testified that she did not remember what happened when she opened the shower curtain, but then testified that she remembered "us kissing and him sucking on my breasts and then after awhile, D. was still crying so I was like, I need to go and get your baby because she's still crying." Defendant told P. not to leave. P. told defendant that she would just put D. to sleep and come back, but she did not feel comfortable and so she did not return. Asked why she did not feel comfortable, P. responded: "it was becoming too much. Like I wasn't, like, expecting him to be naked in the bathroom and all that." P. admitted that she was "kind of okay with what had happened up to that point," but did not want things to go farther.
*597 P. also remembered the time, around the same time or perhaps a year later, that defendant brought her and J. to the park and gave them alcohol. According to P.'s recollection, she and defendant came back to the house while J. stayed in the park, and P. went to the bathroom. When P. got out of the bathroom, defendant pulled her into the garage, placed a piece of cardboard on the floor, laid P. down on it, and, with both of their pants down, attempted to insert his penis in P.'s vagina. However, it would not go in. P. testified that she was trying to keep her legs closed and told defendant to stop and that he was hurting her. R. was in the house at the time. After this experience, P. attempted to distance herself from defendant and stopped coming around.
P. testified that she did not tell any adults what had happened for a long time because she was ashamed and she felt as though she "somewhat led it on." After P. learned that Ja. had come forward, P. decided she wanted to cooperate. Asked again why she did not come forward earlier, P. responded: "I don't know. That's something I got to live with for the rest of my life. I should of came forward but I just kind of didn't want to deal with it, really. I mean I wanted to tell R.; but we didn't know how to tell her. Like, how do you go tell somebody that they married to-that-that they are touching and kissing and feeling and all that stuff? Like, how do you tell somebody that?"
Ra. Doe ( Section 1108 Witness)
Ra. testified pursuant to section 1108. She was 27 years old at the time she testified at trial.
*538 Defendant was Ra.'s uncle. She was uncooperative at trial. Ra. testified that she did not "remember when [she] was 14," and that she did not "remember anything." She repeatedly testified, "I don't remember," "I don't remember anything," and "I don't remember nothing." However, she acknowledged that she had told Detective Jacobo that defendant touched her in a sexual way when she was 14 years old, and that she made similar statements in preliminary hearing testimony. She testified that Jacobo "put words in [her] mouth." She denied that defendant raped her, and then testified that he did not do anything. When the prosecutor asked whether she told Jacobo that defendant touched her vagina and her breasts under her clothes, Ra. responded, "He told me that's what his wife, R., told him that. He kept asking me questions, and I was telling him no; but he said that's what they said and I was scared so I don't know what to say." When asked if she made a similar statement at the preliminary hearing, Ra. responded, "That you guys was asking me, yeah. I said yeah, because I don't know what to say here. I don't like being in this predicament." Ra. testified, "I don't want to cooperate." Ra. also testified that she did not recall defendant giving her a pill that made her feel blurry and sleepy.
*598 The prosecutor played for the jury recordings of interviews between Detective Jacobo, another detective, and Ra. When first contacted, she indicated she did not want to get involved. Ultimately, Ra. told Jacobo that she was 14 years old when "that occurred" between her and defendant at his house in Elk Grove. Ra. told Jacobo that defendant told her to go to the bed, and he would come into the room an hour later. Ra. told Jacobo that defendant did not have sex with her, but he did touch her on her vagina and on her breasts. Defendant had Ra.'s "pants down a little bit," and, when he touched her breasts, he did so under Ra.'s shirt. He would touch her, leave the room, come back, and touch her again. This pattern repeated "[l]ike three times." Ra. told defendant to stop and he responded, " 'I can't,' " but then he stopped. Ra. also told Jacobo that defendant gave her some type of pill that made her feel "blurry" and "sleepy." Weeks later, defendant apologized to Ra. and asked her not to tell on him. Three months after the incident, Ra. told her mother what had happened, and Ra. never talked to defendant again. Ra. also told Jacobo that she told R. about it. R. tried to fight her, but R. later changed her attitude. During the interview, Ra. said she did not want to come to court.
Ra. also denied at trial telling Leslie Zapata, a criminal investigator for the district attorney's office, that her grandmother, her mother, and her uncle called her and pressured her not to testify at the preliminary hearing. She testified that she did not recall telling Zapata that family members had threatened to come to the preliminary hearing to intimidate her. She also did not remember telling Zapata that her mother and grandmother told Ra. that they believed her, but that she should have kept her mouth shut and not spoken with police.
Zapata testified that she picked up Ra., an "uncooperative witness," to transport her to the preliminary hearing. Zapata stayed with Ra. throughout the day. According to Zapata, Ra. was very nervous and reluctant. After the lunch break, Ra. vomited in the restroom. Zapata testified that Ra. stated that she was receiving phone calls from her mother, her grandmother, and her uncles threatening to attend the preliminary hearing to intimidate her. Zapata also testified that Ra. stated that her mother and her grandmother told her that they believed her, but that she should have kept her mouth shut and not *539 talked with the police. Zapata testified that, after the preliminary hearing, she and her partner were walking with Ra. out of the courthouse and towards the district attorney's office when Ra. said she saw her uncles walking towards them.
Defense Evidence
Detective Jacobo testified that he participated in a search of defendant's home. Defendant cooperated with the search. Jacobo testified that there was no relevant evidence found on any of the electronics seized in the search.
*599 R. testified that she and defendant were married for approximately 16 years. R. testified that defendant was manipulative and "probably cheated on me the whole relationship." R. remembered at one point hearing that Ra. had claimed that defendant had done something inappropriate with her. This prompted R. to call Ja., who was nine years old at the time and who was staying at R.'s grandmother's house, and ask Ja. if defendant had done anything to her. At first, Ja. said no. As the conversation continued, Ja. said she did not know or understand, and then she started crying. Then Ja. told R. that defendant did touch her. R. went to the Bay Area to pick Ja. up, and then she called the police. R. took Ja. somewhere to talk to someone, and Ja. told the person she spoke with that it had not happened. R. testified that defendant convinced her that it had not happened. She testified: "I think it was still in the back of my mind, but I don't think I wanted to believe that that happened." R. acknowledged that she continued living with defendant, and continued leaving the children with him.
R. remembered an occasion when defendant and the children picked her up at work, and it seemed like something was wrong with Ja. Ja. was very quiet and R. asked her if everything was okay. Ja. told R. that nothing was wrong.
R. also remembered when, on Christmas Eve in 2009, Ja. told her that defendant had been molesting her. R. called the police, and, later, took Ja. to the police station. Ja. went into a room with a detective. Afterward, Ja. did not tell R. anything about what she told the detective.
R. testified that she moved out with Ja. and D., but acknowledged that, sometime later, she moved back in with defendant. She testified that she did not have anywhere else to go. According to R., moving back in with defendant was supposed to be a temporary arrangement. They ended up living with defendant for approximately one year. During this time, R. and defendant were essentially roommates, and they slept in different rooms.
R. recalled hearing a rumor that defendant was having sex with J. By this time, R. was not with defendant, "so it really didn't matter." However, R. went to talk to J. about it, but "it just kind of went out of control," and after that, R. and J. did not talk. At some point, however, J. told R. about an incident that happened with defendant when J. was younger.
Defendant testified. He claimed that none of the accusations made by Ja., J., P., L., and Ra. were true.
On direct examination, defense counsel asked defendant if he recalled a time in 2001 when R. alleged that defendant had molested Ja. and defendant responded that he did remember her making the accusation. Defense counsel *600 then asked if something had happened between defendant and Ja. Defendant testified that Ja. had asked if she could go to the park and take D. with her, and defendant agreed. However, later, he looked toward the park and saw D. but did not see Ja. Defendant went to the park, where he found Ja. in the *540 bushes with a boy. Defendant testified that Ja. got in trouble for that incident, suggesting that this was a motive for fabricating an allegation of abuse.
A couple of days later, defendant was in the bathroom shaving when Ja. came in to take a shower. Ja. said, " 'Look, Dad,' " and defendant looked over at her. Ja. was pulling on her pubic hair. On cross-examination, defendant stated that he had "ended up pulling, see what she was talking about. It was pubic hair." Defendant testified that, after that, he and R. got in a big fight, and R. went to the Bay Area. Then defendant received a call from a detective asking about whether defendant touched his daughter and he said no. Defendant called Ja. while the detective was still on the line, and, without disclosing that the detective was on the line, asked Ja. where he put lotion on her when he applied it. Defendant asked Ja. if he touched her anywhere other than her arms and legs, and if he touched her "anywhere when you use the bathroom at," and she said no. Defendant testified that the detective told him that the case would be closed. This all occurred when Ja. was nine years old. On cross-examination, defendant confirmed that he was indeed claiming that he, a suspect in the case, was permitted by the detective to make this surreptitious three-way call to his nine-year-old daughter. However, after reviewing the 2001 report of that investigation, defendant acknowledged that he did not see any reference to this three-way call in the report.
Asked if he ever talked to R. about why she called the police, defendant responded: "No. She always say things, do things to me knowing that it-she knew what to do to me. She now [sic ] how I am. She knew how to get back at me everything. At that time I had nowhere to go. I was the one had nowhere to go. She was the one with the job and all that. At that time she had-it was her house so I couldn't just leave. I had nowhere to go."
Defendant testified that he had a history of cheating. Defendant began seeing S. in 2003. Defendant recalled that, in 2005, L. said that he touched her. Defendant recalled one occasion when L. was at S.'s house and was holding the baby. Defendant picked up the baby, gave him a kiss, and set him back down with L. The next day, S. called defendant and told him that L. was saying that defendant touched her. Defendant testified that he did not touch L. inappropriately.
Asked if something happened prior to Christmas Eve 2009 when R. accused him of molesting Ja., defendant testified that he had caught Ja. lying to him about a male friend that she was seeing. Defendant told R. about it *601 and Ja. got in trouble. Also, defendant testified that, on another occasion around that time, he was having sex with a woman at their home. He heard Ja. yelling, and Ja. came downstairs "to tackle the lady." Defendant told Ja. to go back upstairs, and he took the woman home. Ja. told R. about the incident.
On the car ride back from the Bay Area following the Christmas Eve visit, R. again accused defendant of molesting Ja. Defendant was angry and he and R. argued. When they got home, defendant got out of the car, expecting R. to follow and that they would talk more in the house. However, R. "took off in the car."
On cross-examination, defendant testified that, when he was interviewed by police, he told the detective that R. must have fabricated the allegations because he had moved some of her possessions out of the house, and that she was mad at him because he was "surviving without her" and he did not want her back. Defendant further acknowledged that, when the detective told defendant that it was Ja. making the allegations, he shifted his blame to *541 Ja., stating that she had a "daughter-father crush" on him. However, he then testified that he did not believe Ja. was to blame for anything.
Defendant next saw R. and the kids on New Year's. At that time, they all moved back in with him. However, the house was going into foreclosure, R. got an apartment, and she and the children moved out. Defendant moved into a new place, and, after a while, R. and the kids moved back in with him. R. lived with defendant until the end of 2010, when she moved to another apartment. The kids split time living with defendant and R.
Defendant testified that, in 2012, he and R. had various conflicts with each other. One of these conflicts revolved around financial assistance. Defendant received food stamps and "Section 8" housing subsidies ( 42 U.S.C.S. § 1437f ; Welf. & Inst. Code, § 16517, subd. (c) ). The amount defendant received in benefits was increased over what he would receive personally because Ja., D., and their son were living with defendant. When Ja. got pregnant, R. "used [Ja.'s] information to get an apartment," which subjected defendant to scrutiny over his section 8 housing claims. Defendant underwent an interview, and he immediately removed all of the children from his section 8 housing claims. Their son went into the military, and Ja. and D. went to live with R. Defendant also took D.'s name off of his food stamps account, which made R. angry and she removed defendant from her medical benefits. Defendant knew that R., Ja., and D. were receiving benefits, and that they should not also be receiving benefits on his accounts. Defendant did not want to get into trouble with the government for committing fraud.
After Ja. became pregnant, her college grades began to suffer. Defendant confronted Ja. about the issue and Ja. got upset with defendant.
*602 At some point, defendant began living with S.G., his new girlfriend. This was upsetting to R. because defendant had taken the children off of his section 8 housing and yet "then I let another lady come in with her kid." In July 2012, defendant was with Ja.'s boyfriend, when defendant was arrested for driving under the influence. Defendant gave his cell phone to the boyfriend to take home and give to S.G. However, somehow Ja. obtained the phone. Defendant testified that there were photos and videos on the phone, including photos and videos of naked women, which showed that he had been seeing other women. Defendant believed that Ja. went through his phone because, at some point, she answered his phone.
Defendant acknowledged having heard a rumor that he was seeing J. While defendant admitted to being flirtatious with J., he denied that he had an affair with her.
In October 2012, police showed up at defendant's home and searched his entire house. The police seized all of defendant's electronics, and defendant provided police with all of his passwords. Defendant went with the police and was interviewed by Jacobo for approximately one hour. After the interview, defendant went home.
Defendant testified on cross-examination that R. brainwashed "all three of [defendant's] kids." He testified that he believed that everybody, "Whoever was in this case," including S.G., was part of a conspiracy against him. Defendant also testified on cross-examination that he believed that R. made multiple false allegations of child molestation against him because of the fights he had with her. When questioned by the prosecutor why he would continue to stay in the household with a woman who continuously accused him of molesting his children, despite the risk of *542 being incarcerated, defendant responded that he stayed for his children. Defendant also testified that R. sent him threatening text messages. When the prosecutor asked about the seizure and forensic analysis of defendant's five phones and whether defendant was able to find those threatening text messages, defendant responded, "I don't trust what the forensic people did. And I think that they didn't give me my-all my texts...." Defendant asserted that, in viewing the forensic extractions from his cell phones, he saw that the dates had been changed and text messages and logged calls were missing. The prosecutor asked defendant if the police, too, were in on the conspiracy, to which defendant responded, "Ask them. I don't know. I think you in on the conspiracy. I'm sorry."
Verdict and Sentencing
The jury found defendant guilty on all 33 counts, and further found true the allegations that counts one through thirty-one were timely filed.
*603 The trial court sentenced defendant to an aggregate determinate term of 46 years four months, calculated as follows: the upper term of nine years on count thirty-two; consecutive two years (one-third the midterm) on count thirty-three; consecutive eight months (one-third the midterm) on counts one through four; consecutive two years (one-third the midterm) on counts five through fifteen; and consecutive eight months (one-third the midterm) on counts sixteen through thirty-one. In choosing the upper term on count thirty-two, furnishing ecstasy to Ja., the trial court stated that the evidence demonstrated that there were multiple instances of that crime having been committed, and that it believed that defendant should be incarcerated for the maximum term permitted by law.
DISCUSSION
I. Admission of Section 1108 Evidence
A. Additional Background
In her written in limine motions, the prosecutor sought the admission of evidence of uncharged sexual offenses committed against P. and Ra. pursuant to section 1108.[9] The prosecutor asserted that, under section 1108, such evidence is admissible to prove that defendant committed the charged sexual offenses. The prosecution acknowledged that evidence otherwise admissible pursuant to section 1108 is subject to a section 352 balancing analysis. The trial court allowed the evidence concerning both P. and Ra.
B.-E.2.**
3. McKinney and Federal Authorities
Defendant more than once states that he "recognizes our Supreme Court has found section 1108 to be constitutional, but presents this pure question of law to preserve it for further review." Defendant cites McKinney, supra , 993 F.2d 1378 and other older cases, in contending that admission of the *604 section 1108 testimony violated his due process and a fair trial rights. McKinney is often cited in this context. However, as we have previously observed, a "[d]efendant's reliance on McKinney -a case decided before enactment of the federal rules allowing evidence of uncharged sexual assaults and child molestation and the enactment of section 1108-is misplaced. [Citation.] The application of McKinney 's holding in the context of [uncharged *543 sexual misconduct] evidence has been repeatedly rejected. [Citations.] The Ninth Circuit and other federal courts have long since upheld the constitutionality of the federal rules allowing sexual misconduct evidence to establish propensity to commit such crimes." ( People v. Holford (2012) 203 Cal.App.4th 155, 183, fn. 19, 136 Cal.Rptr.3d 713.)
Section 1108 was modeled after rule 413 of the Federal Rules of Evidence (rule 413, 28 U.S.C.).[12] ( People v. Falsetta (1999) 21 Cal.4th 903, 912, 89 Cal.Rptr.2d 847, 986 P.2d 182 ( Falsetta ).) The federal court cases rejecting due process challenges to rules 413 and 414[13] are many and we have found no federal cases concluding that these rules of evidence offend due process. Recently, in United States v. Schaffer (2d Cir. 2017) 851 F.3d 166, the Second Circuit noted that under rule 413, the prosecution "may use evidence of prior sexual assaults precisely to show that a defendant has a pattern or propensity for committing sexual assault." ( Schaffer , at pp. 177-178, fn. omitted.) The Schaffer court observed: "While we recognize that Rule 413 represents an exception to the general 'ban against propensity evidence,' we agree with every other court of appeals that has addressed this issue and hold that, in light of the safeguards provided by Rule 403,[14 ] Rule 413 on its face does not violate the Due Process Clause." ( Schaffer , at p. 177, fns. omitted, & fn. 56, citing United States v. Mound (8th Cir. 1998) 149 F.3d 799, 801, United States v. Enjady (10th Cir. 1998) 134 F.3d 1427, 1430-1433 ( Enjady ), United States v. LeMay (9th Cir. 2001) 260 F.3d 1018, 1026-1027 ( LeMay ) & United States v. Julian (7th Cir. 2005) 427 F.3d 471, 487 ; see also United States v. Castillo (10th Cir. 1998) 140 F.3d 874, 880-881.)
In McKinney , a murder victim's throat was slit, and the medical examiner testified the wounds could have been caused by almost any kind of knife.
*605 ( McKinney, supra , 993 F.2d at p. 1381.) A specific murder weapon was never identified. ( Ibid . ) The prosecution introduced evidence that the defendant had a knife collection of which he was proud and that he scratched on his dormitory closet door with a knife, "Death is His." ( Id . at p. 1382.) The Ninth Circuit concluded that this evidence was probative only of the defendant's character and its admission violated the prohibition against evidence of bad character. ( Id . at pp. 1384-1385.) It further held that, because that prohibition is based on the community's sense of fair play and decency, the admission of the evidence violated due process. ( Ibid . )
However, in LeMay , the Ninth Circuit rejected reliance on McKinney in a case involving evidence of uncharged acts of child molestation admitted under rule 414. ( LeMay, supra , 260 F.3d at pp. 1026-1027.) The court noted that in McKinney it *544 had held that propensity evidence "will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have. Potentially devastating evidence of little or no relevance would have to be excluded under Rule 403. Indeed, this is exactly what Rule 403 was designed to do. We therefore conclude that as long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional." ( LeMay , at p. 1027.) In light of the LeMay court's rejection of McKinney in the context of the admissibility of prior acts of child molestation to show propensity, defendant's reliance on McKinney is clearly misplaced.[15] We expressly reject McKinney as grounds upon which to find that section 1108 is constitutionally invalid on its face and conclude that trial counsel's performance was not deficient for failure to rely upon it. ( People v. Cudjo (1993) 6 Cal.4th 585, 616, 25 Cal.Rptr.2d 390, 863 P.2d 635 [failure to object to the admission of evidence is not ineffective assistance where "there was no sound legal basis for objection"].) *606 California's decisional law concerning the facial constitutionality of section 1108 and the federal analogues are settled and have been settled for some time. We reject the contention as completely meritless, and thus we reject defendant's contention that his trial counsel provided constitutionally ineffective assistance of counsel.
4. Constitutionality of Section 1108 as Applied***
II. CALCRIM No. 1191
A. Additional Background
The trial court instructed the jury with CALCRIM No. 1191 as follows: "The People presented evidence that the defendant committed crimes of sexual assault upon minors, namely [Ra.] and [P.], which were not charged in this case. The sexual assault crimes against [Ra.] and [P.] are defined for you in Instruction 1112. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses and based on that decision, also conclude *545 that the defendant was likely to commit the offenses as charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove the charge beyond a reasonable doubt."[18] *607 The prosecutor discussed the propensity evidence in her closing argument, stating, for example, "If you conclude that more likely than not those crimes occurred, you can use that as propensity evidence when you are evaluating the charged crimes. In other words, you can conclude that this defendant is disposed or inclined to commit sexual offenses and, therefore, that he was more likely to have committed the crimes for which he's charged." After detailing points from Ra.'s and P.'s testimony, the prosecutor stated, "So based on Ra.'s prior statements and P.'s testimony, you can conclude that the defendant has a propensity to commit sexual offenses, and you can build that into your evaluation of the current charges."
B. Defendant's Contentions
Defendant asserts that CALCRIM No. 1191 is flawed because it allows jurors to infer guilt based merely on the commission of other crimes established only by a preponderance of the evidence, effectively reducing the burden of proof and violating his due process rights. More specifically, defendant asserts: "The instruction tell[s] jurors that they may ignore the general presumption of innocence and infer guilt based, not on their evaluation of the evidence of the present offense, but upon their finding of another sexual offense by a lower standard of proof." Defendant emphasizes that, while the instruction does state that jurors may not find a defendant guilty based only on uncharged offenses, it neither reiterates the presumption of innocence nor "counter[s] the effective presumption of guilt permitted by the language of the instruction." Defendant further asserts that CALCRIM No. 1191 is confusing, internally inconsistent and inconsistent with the instruction on circumstantial evidence. He concedes that the California Supreme Court has approved of a substantially similar instruction and that this court is bound by our high court's precedent, but again states that he is raising the issue to preserve it for federal review.[19] While defendant acknowledges *546 that trial counsel did not object to CALCRIM No. 1191, he *608 asserts that, because the issue affects his substantial rights, he may raise this issue for first time on appeal.
C. Forfeiture
" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " ( People v. Hudson (2006) 38 Cal.4th 1002, 1011-1012, 44 Cal.Rptr.3d 632, 136 P.3d 168.) As defendant asserts, however, we may review his contention concerning an instruction given "if the substantial rights of the defendant were affected thereby." ( Pen. Code, § 1259.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim-at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " ( People v. Ramos (2008) 163 Cal.App.4th 1082, 1087, 78 Cal.Rptr.3d 186 ( Ramos ).) We next consider the merits and reject defendant's contentions.
D. Analysis
Our high court has held that CALJIC No. 2.50.01, the predecessor to CALCRIM No. 1191, is a correct statement of the law. ( People v. Villatoro (2012) 54 Cal.4th 1152, 1160, 144 Cal.Rptr.3d 401, 281 P.3d 390, citing *609 People v. Reliford (2003) 29 Cal.4th 1007, 1012-1016, 130 Cal.Rptr.2d 254, 62 P.3d 601 ( Reliford ) [requiring § 1108 evidence be proved by a preponderance of the evidence does not *547 reduce the prosecution's burden of proof as to the charged offenses].) For the purpose of evaluating defendant's claims, there is no material difference between CALCRIM No. 1191 and its predecessor CALJIC No. 2.50.01. ( People v. Cromp (2007) 153 Cal.App.4th 476, 480, 62 Cal.Rptr.3d 848 ; People v. Schnabel (2007) 150 Cal.App.4th 83, 87, 57 Cal.Rptr.3d 922.) Thus, relying on Reliford , the Courts of Appeal for the Second District and this district have concluded that CALCRIM No. 1191 is also correct statement of the law and does not reduce the prosecution's burden of proof. ( People v. Anderson (2012) 208 Cal.App.4th 851, 895-898, 144 Cal.Rptr.3d 606 ; Cromp , at p. 479, 62 Cal.Rptr.3d 848 ; Schnabel , at p. 87, 57 Cal.Rptr.3d 922.) Defendant's arguments here concerning CALCRIM No. 1191 -purported reduction of the burden of proof, the instruction allows jurors to find a defendant guilty solely based on prior uncharged acts, and that the instruction is confusing and misleading because it employs a different standard of proof for the prior sexual offense findings than for the jury's ultimate determination of guilt-are all foreclosed by our high court's analysis and conclusions in Reliford . ( Reliford , at pp. 1013-1016, 130 Cal.Rptr.2d 254, 62 P.3d 601.) As this court noted in Schnabel , "[w]e are in no position to reconsider the Supreme Court's holding in Reliford [citation], and by analogy to Reliford , we reject defendant's argument regarding the jury instruction on use of his prior sex offenses." ( Schnabel , at p. 87, 57 Cal.Rptr.3d 922, citing Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)
However, defendant makes one argument not expressly addressed by our high court in Reliford and not addressed in any case published since Reliford . Defendant contends that the asserted confusion engendered by CALCRIM No. 1191 was compounded by CALCRIM No. 224, the instruction on circumstantial evidence. Defendant focuses on the first paragraph in CALCRIM No. 224, which reads in pertinent part: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."[20] Defendant asserts that *548 CALCRIM No. 1191 contradicts CALCRIM No. 224 *610 because the former tells the jurors that, if they conclude that the prosecution established by a preponderance of the evidence that defendant committed the prior sexual offenses, the jurors may conclude from that evidence that defendant was likely to commit the charged offenses. CALCRIM No. 224 addressing circumstantial evidence, on the other hand, tells the jurors that each fact essential to a conclusion of guilt must be proved beyond a reasonable doubt. We reject defendant's contention for three reasons. First, in advancing this argument, defendant relies on a case that predated Reliford and addressed an earlier, flawed version of the section 1108 instruction. Second, the reasoning in Reliford concerning section 1108 evidence and subsequent cases from our high court concerning section 1108 and section 1101, subdivision (b), evidence compels rejection of defendant's claim. Third, the wording of CALCRIM No. 1191 clearly tells juries that even if they find defendant committed the uncharged sexual misconduct, the reasonable doubt standard still applies to the charged offenses.
Defendant relies on People v. Frazier (2001) 89 Cal.App.4th 30, 107 Cal.Rptr.2d 100 ( Frazier ), a case decided nearly two years before Reliford , in contending that the current section 1108 and circumstantial evidence instructions are in conflict. The problem with defendant's position is that Frazier involved a prior version of the section 1108 instruction. That instruction, an earlier version of CALJIC No. 2.50.01, told juries that " '[i]f you find the defendant committed a prior sexual offense, you may but are not required to infer that the defendant had a disposition to commit sexual offenses. If you find the defendant had this disposition, you may, but are not required to infer that he was likely to and did commit the crimes of which he is accused.' " ( Frazier , at p. 34, 107 Cal.Rptr.2d 100.) Also, the instruction did not include the cautionary instruction added in a later version of CALJIC No. 2.50.01, which stated: " 'However, if you find by a preponderance of the evidence that the defendant committed prior sexual offenses, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. ' " ( Frazier , at pp. 34-35, fn., 107 Cal.Rptr.2d 100 omitted.) The Frazier court held that the instruction was constitutionally infirm because it told jurors they could convict the defendant of the charged offenses based solely on their determination he had committed prior sexual offenses. ( Id . at p. 35, 107 Cal.Rptr.2d 100.) The court reasoned that the "and did commit"
*611 language told jurors that "proof of prior sexual offenses is enough to prove guilt of the current offenses" ( id. at p. 36, 107 Cal.Rptr.2d 100, fn. omitted) and no instruction countered or made up for the message that jurors could convict solely based on a determination that the defendant committed the prior offenses ( id . at p. 35, 107 Cal.Rptr.2d 100 ). The court then went on to address the People's contention that defects in an instruction can be viewed as harmless when cured by other instructions. ( Id . at p. 36, 107 Cal.Rptr.2d 100.) On this point, the court reasoned that the combination of the preponderance of the evidence standard to determine whether the defendant had committed the prior offenses and the circumstantial evidence instruction, which told the jury each fact supporting an inference essential to establish guilt must be proven beyond a reasonable doubt, added to the confusion. ( Id . at pp. 36-37, 107 Cal.Rptr.2d 100.) "If the jury believed the propensity evidence was essential to establish defendant's guilt, then [the circumstantial *549 evidence instruction] was in direct conflict with [the preponderance of the evidence instruction]." ( Id . at p. 37, 107 Cal.Rptr.2d 100, fn. omitted.) The confusion that results from "attempting to apply the [trial] court's instructions 'as a whole,' " the court reasoned, would tempt juries "to take the path of least resistance which leads directly from evidence of the defendant's disposition to a guilty verdict." ( Ibid . ) Based on all of these reasons, the court concluded the older version of the section 1108 instruction it reviewed denied the defendant due process because it allowed the jury to convict him without proof beyond a reasonable doubt as to every element of the charged offenses. ( Frazier , at p. 37, 107 Cal.Rptr.2d 100.) Frazier has not been relied upon in any published case for its discussion concerning the section 1108 and circumstantial evidence instructions.
CALCRIM No. 1191 does not suffer from the same shortcomings as the section 1108 instruction analyzed in Frazier . Those shortcomings were corrected in later versions of CALJIC No. 2.50.01 and do not appear in CALCRIM No. 1191. The "and did commit" language has long since been eliminated. (See People v. James (2000) 81 Cal.App.4th 1343, 1348, fn. 8, 96 Cal.Rptr.2d 823 [suggesting that the " 'and did commit' " language be omitted from CALJIC instruction].)
Furthermore, despite the fact that the revised CALJIC No. 2.50.01 instruction in Reliford included the "and did commit" language ( Reliford, supra , 29 Cal.4th at p. 1012, 130 Cal.Rptr.2d 254, 62 P.3d 601 ), the court nevertheless approved of the instruction. The revised instruction the Reliford court reviewed instructed that if jurors found by a preponderance of the evidence that the defendant committed the uncharged offenses, that finding was not sufficient by itself to prove beyond a reasonable doubt that the defendant committed the charged crimes. ( Id . at p. 1013, 130 Cal.Rptr.2d 254, 62 P.3d 601.) "By telling jurors that evidence of prior offenses is insufficient to prove defendant's guilt of the charged offenses beyond a reasonable doubt, *612 jurors necessarily understand that they must consider all the other evidence before convicting defendant." ( Id . at p. 1015, 130 Cal.Rptr.2d 254, 62 P.3d 601.)[21]
CALCRIM No. 1191 includes similar language in addition to other important admonitions. In addressing when and how juries may consider evidence of prior acts of sexual misconduct under section 1108, CALCRIM No. 1191 tells jurors: (1) they may not even consider the evidence unless it is proved by a preponderance of the evidence; (2) if they decide that standard is met, they "may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses"; (3) based on that decision, they may conclude that the defendant was likely to commit the charged offenses (not that he did commit the charged offenses); (4) the determination the defendant committed the prior misconduct "is only one factor to consider along with all the other evidence "; (5) the determination the defendant committed the prior acts is "not sufficient by itself to prove that the defendant is guilty of" the charged offenses; and (6) "[t]he People must still prove" the charge "beyond a reasonable doubt." (Italics added.) Consistent with *550 Reliford , CALCRIM No. 1191 cautions jurors that the propensity inference is not sufficient to prove the charged offenses; it also does not include the "and did commit" language the Frazier court found so problematic.
Moreover, our high court's discussion in Reliford concerning the circumstantial evidence instruction convinces us that defendant's position lacks merit. In sanctioning the preponderance of the evidence standard for considering section 1108 evidence, the court in Reliford actually relied upon the fact that the jury had been given instructions on circumstantial evidence and the burden of proof regarding the charged offenses. "Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense.... The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' [Citations.] ... In addition, the jury was told that circumstantial evidence could support a finding of guilt of the charged offenses only if the proved circumstances could not be reconciled with any other rational conclusion [citation]-which is merely another way of restating the reasonable-doubt standard. [Citation.] The jury thus would have understood that a conviction that relied on inferences to be drawn from defendant's prior offense would have to be proved beyond a reasonable *613 doubt." ( Reliford, supra , 29 Cal.4th at p. 1016, 130 Cal.Rptr.2d 254, 62 P.3d 601.) Thus, it is apparent our high court saw no conflict between the section 1108 instruction and the circumstantial evidence instruction.
In Loy, supra , 52 Cal.4th 46, 127 Cal.Rptr.3d 679, 254 P.3d 980, our high court further discussed circumstantial evidence in the context of approving a section 1108 evidence instruction. The court observed that the earlier version of CALJIC No. 2.50.01 under consideration there, "merely told the jury it could 'infer' from defendant's prior sexual crimes that he committed the charged crime. It did not say such an inference itself constituted proof beyond a reasonable doubt. The jury was also instructed that 'an inference is a deduction of fact that can logically and reasonably be drawn from another fact or group of facts established by the evidence.' [Citation.] But a logical deduction is not the same as proof beyond a reasonable doubt. No reasonable jury would assume that this inference, i.e., this logical deduction, substituted for proof beyond a reasonable doubt. The instructions given 'provide only that an inference of guilt may be drawn from prior offenses that have been proved by a preponderance of evidence. They do not suggest that an inference so drawn is sufficient for a finding of guilt.' [Citation.] The jury still had to find that the facts of the charged crime had been proved beyond a reasonable doubt." ( Loy , at p. 75, 127 Cal.Rptr.3d 679, 254 P.3d 980.) The same could be said for CALCRIM No. 1191.
Our high court's discussion of the circumstantial evidence instruction in Reliford and circumstantial evidence in general in Loy is consistent with the court's more recent discussion specific to the circumstantial evidence instruction and the preponderance standard as it relates to section 1101, subdivision (b), uncharged misconduct evidence.[22] Our high court has *551 explained that the beyond a reasonable doubt standard of proof applicable to circumstantial evidence generally and the preponderance of the evidence standard applicable to other crimes evidence "are reconciled by the different purposes for which the evidence is used. When evidence of uncharged misconduct is admitted for the purpose of establishing identity or intent, we have explained that the crimes are mere 'evidentiary facts.' [Citation.] The jury cannot consider them at all unless they find them proven by a preponderance of the evidence. 'If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered. [Citations.]' [Citation.] If the jury finds the facts sufficiently proven for consideration, it must still decide whether the facts are sufficient, taken with all the other evidence, to prove the defendant's *614 guilt beyond a reasonable doubt." ( People v. Virgil (2011) 51 Cal.4th 1210, 1259-1260, 126 Cal.Rptr.3d 465, 253 P.3d 553 ( Virgil ), citing People v. Medina (1995) 11 Cal.4th 694, 763, 47 Cal.Rptr.2d 165, 906 P.2d 2 & People v. Foster (2010) 50 Cal.4th 1301, 1347-1348, 117 Cal.Rptr.3d 658, 242 P.3d 105 ( Foster ).) In Virgil, Foster , and Medina , the uncharged misconduct evidence was admitted to prove identity. ( Virgil , at p. 1258, 126 Cal.Rptr.3d 465, 253 P.3d 553 ; Foster , at pp. 1346-1348, 117 Cal.Rptr.3d 658, 242 P.3d 105 ; Medina , at pp. 747-748, 47 Cal.Rptr.2d 165, 906 P.2d 2.) Identity is an ultimate fact, as are the elements of the crime which must be proved beyond a reasonable doubt. ( People v. Thompson (1980) 27 Cal.3d 303, 315, fn. 13, 165 Cal.Rptr. 289, 611 P.2d 883.) Propensity is considered an intermediate fact. ( Id . at p. 317, fn. 17, 165 Cal.Rptr. 289, 611 P.2d 883.) An intermediate fact is a fact from which the existence of an ultimate fact may be drawn. ( Id. at p. 315, 165 Cal.Rptr. 289, 611 P.2d 883.) Unlike ultimate facts, the prosecution is under no obligation to prove intermediate facts to establish the charged offenses. We see no reason why the reasoning from Virgil , Foster , and Medina concerning the section 1101, subdivision (b), instruction pertaining to the ultimate fact of the identity of the perpetrator should not apply to section 1108 evidence admitted to show the intermediate fact of propensity, a fact the prosecution is not required to prove to establish the charged offenses.
Lastly, the final sentence in CALCRIM No. 1191 tells jurors, "[t]he People must still prove " the charge "beyond a reasonable doubt." (Italics added.) Thus, the jurors are effectively admonished that, even if they find defendant committed the uncharged sexual misconduct, the reasonable doubt standard "still" applies to the charged offenses.[23]
We conclude that the jurors could readily understand the distinction drawn, and the differing burdens of proof attached to CALCRIM Nos. 224 and 1191. We further conclude that it is not reasonably likely a jury would conclude that the lower standard of proof applicable to the uncharged offenses would apply to the proof of the charged offenses. ( Reliford, supra , 29 Cal.4th at pp. 1012-1016, 130 Cal.Rptr.2d 254, 62 P.3d 601.)
*552 To the extent that defendant's contentions are not foreclosed by binding precedent from our high court, we conclude that they lack merit.
III.-VII.†
*615 DISPOSITION
The sentences imposed on counts one and two are vacated and the matter is remanded to the trial court for resentencing on those counts, at which the trial court shall choose to impose concurrent or consecutive sentences, articulate the reasons for its choice if it chooses to impose consecutive sentences, and impose a court operations assessment and a criminal conviction assessment on each of the 33 counts as stated herein. The trial court is then directed to prepare an amended abstract of judgment and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.
We concur:
HOCH, J.
RENNER, J.

Further undesignated statutory references are to the Evidence Code.

Now CALCRIM No. 1191A.

At trial, each of the victims was referred to by the last name of Doe. To further protect the personal privacy interests of the victims and other people involved, we refer to them by the initial of their first name, except where they share the same first initial with another witness. We realize that this may present some difficulty to the reader, but on balance, find that their privacy interests warrant this treatment. (Cal. Rules of Court, rule 8.90(b).)

The information alleged sexual penetration and oral copulation of J., a victim under 16 years of age (Pen. Code, § 289, subd. (i) -count one; § 288a, subd. (b)(2)-count two).

The information alleged two counts of lewd or lascivious acts on L., a child 15 years of age, defendant being at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1) ; counts three & four).

L. testified that, at the time, defendant thought S.'s son was his son. It turned out the baby was not defendant's child.

Miyamoto was unavailable at the time of trial. Her video-recorded testimony from a prior proceeding was played for the jury.

Regarding Ja., the information alleged 11 counts of lewd or lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a); counts five through fifteen); 16 counts of lewd or lascivious acts on a child of 14 years of age (counts sixteen through twenty-three) and 15 years of age (counts twenty-four through thirty-one), defendant being at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1) ); and two counts of furnishing a controlled substance (cocaine & ecstasy) to a minor (Health & Saf. Code, §§ 11353 & 11380, subd. (a); counts thirty-two & thirty-three).

In the alternative, the prosecutor sought admission of the evidence pursuant to section 1101, subdivision (b), a request we need not address here.

See footnote *, ante .

Rule 413(a) provides in pertinent part: "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant."

Federal Rules of Evidence, rule 414 (rule 414 ), provides, in pertinent part: "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." (Rule 414(a), 28 U.S.C., boldface omitted.)

Federal Rules of Evidence, rule 403 (rule 403, 28 U.S.C.), is the federal counterpart to section 352 and provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Appellate counsel here would apparently have us ignore the federal authorities, including LeMay , because none of the federal cases published before this appeal were mentioned in defendant's briefing. We remind counsel of our high court's admonition that "[a]ttorneys are officers of the court and have an ethical obligation to advise the court of legal authority that is directly contrary to a claim being pressed." (In re Reno (2012) 55 Cal.4th 428, 510, 146 Cal.Rptr.3d 297, 283 P.3d 1181, citing Batt v. City and County of San Francisco (2007) 155 Cal.App.4th 65, 82, fn. 9, 65 Cal.Rptr.3d 716.) As the court in Reno noted, "Rule 5-200 of the Rules of Professional Conduct addresses the issue and provides that, '[i]n presenting a matter to a tribunal, a member: [¶] (A) Shall employ ... such means only as are consistent with truth; [and] [¶] (B) Shall not seek to mislead the judge ... by an artifice or false statement of fact or law....' " (In re Reno , at p. 510, 146 Cal.Rptr.3d 297, 283 P.3d 1181.) Relying on the Ninth Circuit's decision in McKinney to advance and preserve the contention that section 1108 is facially unconstitutional, appellate counsel here failed to cite pertinent and contrary federal authorities even though he was obligated to do so.

See footnote *, ante .

When the trial court read CALCRIM No. 1191 to the jury, twice it interposed the word "others" for the term "the charged offenses." However, the trial court corrected itself as it finished reading the instruction to the jury, and the written jury instructions, as corrected in handwriting, accurately reflect the correct instruction. Additionally, in reading the instruction to the jury, it appears that the trial court omitted the last sentence reading, "The People must still prove the charge beyond a reasonable doubt." However, the written jury instructions included this sentence. "We of course presume 'that jurors understand and follow the court's instructions.' " (People v. Wilson (2008) 44 Cal.4th 758, 803, 80 Cal.Rptr.3d 211, 187 P.3d 1041.) "This presumption includes the written instructions." (Ibid . ) " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' " (People v. Mills (2010) 48 Cal.4th 158, 201, 106 Cal.Rptr.3d 153, 226 P.3d 276.) Because the jury was given the correctly worded instruction in written form, and because, on appeal, we give precedence to the written instructions (ibid . ), we disregard the error in the oral reading which was not raised by either party.

We note that federal district courts are required to "make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the defendant committed the [uncharged sexual offense] and that it constituted an 'offense of sexual assault' for purposes of Rule 413." (United States v. Dillon (5th Cir. 2008) 532 F.3d 379, 387, citing United States v. Guidry (5th Cir. 2006) 456 F.3d 493, 501, 503, fn. 5 ; Enjady, supra , 134 F.3d at p. 1433 ; Johnson v. Elk Lake School Dist. (3d Cir. 2002) 283 F.3d 138, 152-155 ; see also Watkins v. Meloy (7th Cir. 1996) 95 F.3d 4, 6 [noting that "[p]roof of prior bad acts, where it is permitted, requires only a preponderance of the evidence, rather than proof beyond a reasonable doubt as in a criminal trial"].) Similarly, evidence proffered pursuant to rule 414, must be sufficient to support a finding by a preponderance of the evidence that the defendant committed the subject acts. (United States v. McHorse (10th Cir. 1999) 179 F.3d 889, 899 [discussing the admission of such evidence based on a rule 403 balancing].) A number of the federal circuits do not appear to require that the district courts instruct jurors that before they consider such evidence, they must find that the prosecution established the uncharged acts by a preponderance of the evidence, or by any particular standard, but instead these district courts only instruct the jurors as to the purposes for which the evidence may be used. (E.g., 9th Cir. Crim. Jury Instns. (2010) Instn. No. 2.12 < http://www3.ce9.uscourts.gov/jury-instructions/node/328> [as of Nov. 28, 2018], archived at < https://perma.cc/SC2K-AYGN> ["You are about to hear evidence that the defendant [may have committed] [was convicted of] a similar offense of [sexual assault] [child molestation]. [¶] You may use this evidence to decide whether the defendant committed the act charged in the indictment. You may not convict the defendant simply because he [may have committed] [was convicted of] other unlawful acts. You may give this evidence such weight as you think it should receive or no weight. [¶] [You may not use this evidence, however, to decide whether the defendant [insert improper purpose, e.g., made a statement in this case or destroyed evidence in this case ].]"; id. , Instn. No. 2.13 < http://www3.ce9.uscourts.gov/jury-instructions/node/323> [as of Nov. 28, 2018], archived at < https://perma.cc/2DL4-XV42> [limited purpose of evidence].) However, in the Eighth Circuit, courts do instruct the jury that they may consider the uncharged sexual misconduct only if the jurors unanimously find that the evidence "is more likely true than not true." (8th Cir. Crim. Jury Instns. (2017) Instn. No. 2.08A, p. 41 < http://www.juryinstructions.ca8.uscourts.gov/Criminal-Jury-Instructions-2017.pdf> [as of Nov. 28, 2018], archived at < https://perma.cc/SGL7-BARZ>.)

It is not clear why the trial court gave CALCRIM No. 224, which should not be used when the circumstantial evidence is incidental to and corroborative of direct evidence. (People v. Malbrough (1961) 55 Cal.2d 249, 250-251, 10 Cal.Rptr. 632, 359 P.2d 30 ; People v. Shea (1995) 39 Cal.App.4th 1257, 1270-1271, 46 Cal.Rptr.2d 388 [noting that the CALJIC predecessor to CALCRIM No. 224 should not have been given in a sexual assault case based on the testimony of the victim and the defendant on the issue of consent-no consent]; see also People v. Thongvilay (1998) 62 Cal.App.4th 71, 86-87, 72 Cal.Rptr.2d 738 [circumstantial evidence instruction not required where the prosecution was based on witness testimony and the defendant's admissions]; Judicial Council of Cal., Crim. Jury Instns. (2018) Bench Notes to CALCRIM No. 224, p. 52.) The instant prosecution was a direct evidence case as to defendant's conduct; any circumstantial evidence of defendant's conduct was corroborative of the direct evidence presented by the testimony of the victims. Nevertheless, because the evidence at issue here was circumstantial evidence of defendant's propensity and a propensity is not only circumstantial evidence defendant may have committed the charged crime (Falsetta, supra , 21 Cal.4th at p. 915, 89 Cal.Rptr.2d 847, 986 P.2d 182 ; People v. Karis (1988) 46 Cal.3d 612, 636, 250 Cal.Rptr. 659, 758 P.2d 1189 ), but also has some bearing on the requisite intent and/or mental state, it would have been appropriate to give CALCRIM No. 225. That instruction pertains to circumstantial evidence used to prove the requisite intent or mental state and contains the same language as that in CALCRIM No. 224 upon which defendant focuses. Defendant makes no argument about the use of CALCRIM No. 224 instead of 225 and thus we have no occasion to further discuss it.

Later, in Loy , another case reviewing a section 1108 instruction that included the "and did commit" language, our high court observed that, while "[i]t is no doubt useful to admonish the jury specifically that evidence of the prior sexual offense alone is not sufficient to convict," it is not critical. (People v. Loy (2011) 52 Cal.4th 46, 74, 127 Cal.Rptr.3d 679, 254 P.3d 980 (Loy ).)

Section 1101, subdivision (b), provides prior misconduct may be admitted for a noncharacter purpose such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented."

We may also consider the argument of counsel in determining the effect on a jury of purported confusion or ambiguity in jury instructions. We note the prosecutor said nothing that would cause the jury to convict of the charged offenses based solely on the propensity evidence or to convict him of the charged offenses based on the preponderance of the evidence standard.

See footnote *, ante .