Filed 6/24/24  P. v. Kelling CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br><br>CHRISTIAN KELLING,<br><br>        Defendant and Appellant. | A164556<br><br>(Alameda County<br>Super. Ct. No. 18CR019574)<br><br><br>**ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING**<br>    **[NO CHANGE IN JUDGMENT]** |

**THE COURT\*:**

It is ordered that the opinion filed herein on June 18, 2024, be modified in the following particulars:

1.      On page 7, at the end of the first paragraph in section II, a new footnote (fn. 2) shall be added after the sentence that reads, "We will therefore consider the merits."  The footnote shall read:

> 2 In a petition for rehearing, defendant argues that instead of examining the merits of his claim of instructional error to determine whether his substantial rights were affected, we should treat his challenge as not forfeited because if his claim is correct the instruction affected his substantial rights.  (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime

\* Tucher, P.J., Fujisaki, J., and Petrou, J. participated in the decision.

1

affect the substantial rights of the defendant, thus requiring no objection for appellate review"]; see also *Teal v. Superior Court* (2014) 60 Cal.4th 595, 600 ["a postjudgment order 'affecting the substantial rights of the party' (§ 1237, subd. (b)) does not turn on whether that party's claim is meritorious, but instead on the nature of the claim and the court's ruling thereto"].) We need not delve into the fine points of the question defendant raises, because, as we shall explain, we find no error in giving either the instruction on motive or the instruction on imperfect self-defense, which defendant also challenges.

All other footnotes will be renumbered accordingly.

2. On page 10, replace the final sentence of section II ("His substantial rights were therefore not affected by the instruction") with the following:

He has not shown the trial court erred in giving the instruction.

3. On page 11, replace the second sentence of the first paragraph of section III shall with the following:

Once again, defendant did not raise this objection at trial, but we will consider the question on the merits. (See *Phea, supra*, 29 Cal.App.5th at p. 608.)

4. On page 13, replace the final sentence of section III ("Defendant has not shown the instruction affected his substantial rights") with the following:

Defendant has not shown it was error to include the optional language in the instruction.

These modifications do not effect a change in the judgment.

Appellant's petition for rehearing is denied.


Dated:_ 6/24/2024__                    _Tucher, P.J._____ P.J.


*People v. Kelling* (A164556)

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>CHRISTIAN KELLING,<br><br>        Defendant and Appellant. | A164556<br><br>(Alameda County<br>Super. Ct. No. 18CR019574) |

Defendant Christian Kelling appeals a judgment entered upon a jury verdict finding him guilty of second degree murder and shooting at an occupied motor vehicle.  He contends the trial court erred in instructing the jury and in sentencing him.  We reject defendant's claims of instructional error, but we agree that the trial court committed sentencing error that requires remand for resentencing.  Defendant also contends the trial court violated the California Racial Justice Act of 2020 (RJA).  (See Pen. Code, § 745, added by Stats. 2020, ch. 317, § 3.5.)[1]  We will not decide his RJA claims in the first instance, but defendant may raise them in the trial court on remand in accordance with the procedures set forth in the RJA.

---

[1] All undesignated statutory references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Shooting*

This case arises out of a drug deal that took place December 4, 2018. The murder victim, Damani Chadly, and his friend Robert Johnston arranged to buy marijuana from defendant, intending to pay with counterfeit money. They planned to give the impression that they might have a weapon, give defendant the fake money, and drive away.

Johnston testified at trial that he and Chadly went in Johnston's car to meet defendant in Fremont. Defendant was waiting for them in his car. Chadly and Johnston got into defendant's car and talked with him for a few minutes. Chadly implied that he had a weapon, and defendant said he did not have one. They gave defendant the fake money. Defendant noted that one of the bills was ripped, and Chadly said he and Johnston would need to go back to Johnston's car to get the other half. Chadly and Johnston returned to Johnston's car with four bags of marijuana and got in, with Chadly on the passenger side. Chadly told Johnston, "[L]et's go," and Johnston started the car. Johnston saw defendant get out of his car and walk toward the passenger side of Johnston's car, holding something and yelling as he approached them. Once defendant had moved far enough that Johnston could move the car without hitting him, Johnston began to turn the wheel of the car to the left and hit the gas, causing the tires to "skirt," or make a squealing noise. The right side of the car came within approximately two feet of defendant.

As he started to drive, Johnston heard three gunshots in quick succession, a brief pause, then two shots from the back. The passenger side window and rear window were shattered. Johnston crashed into a neighboring house, realized Chadly was dead, and fled the scene.

Shortly after the incident, Johnston spoke with a police detective and gave a somewhat different version of events than he provided at trial; he initially said he left defendant's car before Chadly, and Chadly then ran to Johnston's vehicle. At trial, however, Johnston said that this statement was false, and he denied that Chadly stayed behind when he left defendant's car or that Chadly then ran to Johnston's vehicle. Johnston testified that he told his original story in an effort to minimize his own involvement in the drug deal. In the interview with the detective, Johnston also acknowledged that defendant could have thought he was trying to run him over.

### The Victims' Wounds

Johnston was hit by one bullet and suffered injuries to his hand and forearm, but he survived and testified at trial. Chadly suffered two gunshot wounds to his head, which entered from the right, and one to his back, which damaged his spinal cord, and he died of his wounds. The doctor who carried out the autopsy noticed scrapes and bruises on Chadly's forehead, which could have been caused by blunt force trauma, and scrapes and bruising to his hand that could have been offensive or defensive injuries. Chadly was six feet, two inches tall, and he weighed about 240 pounds.

### Defendant's Actions After the Shooting

Later on the evening of the shooting, defendant called his friend Michael Lopez and said he wanted to come over and talk. They had been friends for several years, since they were in high school together, and had been to gun ranges together. Defendant had a Glock handgun, and he had told Lopez that firearms gave him a "thrill."

When defendant reached Lopez's house, he said he needed to get away and wanted to buy Lopez's car, but that first he wanted to go back to his house and gather his belongings. Lopez drove defendant home, where

3

defendant gathered clothes, money, and marijuana. They went back to Lopez's house, and defendant told Lopez that he had done a deal, he noticed he had been paid with fake money, he confronted the buyers, they tried to flee, and he fired at them around five times. Defendant said he was not trying to hurt anyone but that he wanted to frighten them, or "fuck their shit up." He did not say the customers had assaulted him, that they had a weapon, that they tried to run him over with their car, that he had been frightened, or that he had been defending himself.

Defendant paid Lopez for his car and said he was going to Texas, where he would "lay low for a while." Before leaving, defendant gave Lopez two parts of a gun and asked him to dispose of them. Defendant was later found and arrested in Texas.

### The Defense

The theory of the defense at trial was that defendant shot into Johnston's car in self-defense, fearing Johnston was accelerating toward him and the car would hit him. For this theory, defendant relied on the evidence that Johnston and Chadly implied they had a firearm; Johnston's statements to the police—later recanted—that Chadly stayed back when Johnston returned to his own car and that Chadly then ran to Johnston's vehicle; the evidence of the injuries to Chadly's hands and forehead, which he argued could have been the result of a physical altercation with defendant; defendant's proximity to Johnston's vehicle when Johnston started driving; and the speed with which Johnston began driving.

### Verdict and Sentencing

The jury found defendant guilty of second degree murder of Chadly (§ 187, subd. (a); count 1) and shooting at an occupied motor vehicle (§ 246; count 3). In connection with counts 1 and 3, it found true allegations he

4

personally and intentionally discharged a firearm and caused Chadly's death or great bodily injury to Johnston. (§ 12022.53.) The jury found defendant not guilty of the attempted murder or attempted voluntary manslaughter of Johnston. (§§ 187, subd. (a), 192, subd. (a), 664; count 2.)

The trial court sentenced defendant to 15 years to life for second degree murder with an additional 25 years to life for the gun enhancement (§ 12022.53, subd. (d)), and the five-year midterm for shooting into an occupied vehicle as well as another 10 years for the gun enhancement (§ 12022.53, subd. (b)), to run consecutively, for a total term of 55 years to life. This timely appeal ensued.

## DISCUSSION

### I. Instruction on Contrived Self-Defense

Defendant contends the trial court erred when it instructed the jury pursuant to CALCRIM No. 3472 on contrived self-defense. Over defendant's objection, the jury was instructed: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Defendant contends there was no evidence to support this instruction and he was prejudiced by its use.

A court must instruct the jury on general principles of law raised by the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) However, it is error to instruct on principles of law that are not relevant to the issues raised by the evidence, to avoid confusing and misleading the jury. (*People v. Mills* (2012) 55 Cal.4th 663, 680.) Thus, " 'before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681.)

5

The instruction on contrived self-defense reflects the principle that " 'self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.' " (*People v. Hinshaw* (1924) 194 Cal.1, 26.) Applying this principle, the court in *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334, found instruction with CALCRIM No. 3472 proper where the defendant walked to a victim's vehicle, screamed, and jabbed his finger toward her face, whereupon she threw something in his direction and may have kicked him. At that point, "if the jury determined that [the victim kicked defendant] in response to defendant's aggressive conduct, defendant did not have the right to use force to settle a physical confrontation he arguably created." (*Ibid*.)

We similarly see no error in instructing the jury on contrived self-defense here. There is evidence that defendant, angry that Chadly and Johnston had cheated him, approached their car while holding a gun and yelling, and that he intended, as he admitted to Lopez, to frighten them. As they began to drive off he fired three shots at the car, then two more that hit the back of the car as it drove away. This evidence is sufficient to support an inference that defendant initiated a potentially deadly confrontation and, if Johnston drove the car away in a way that caused defendant to believe himself threatened, that danger was a response to defendant's own actions. The jury could have found, based on the evidence, that defendant provoked the confrontation fully intending to use deadly force if met with resistance.

Nor does *People v. Conkling* (1896) 111 Cal. 616 support defendant's claim of error. In *Conkling*, a man traversing private property on a road he may not have had a legal right to use killed the leaseholder in possession of the property and then pleaded self-defense. The jury was instructed that the

6

killing was justified only if " 'the defendant was wholly without any fault imputable to him by law in bringing about the commencement of the' " fatal confrontation, a theory that centered the question of whether the defendant was trespassing when he killed the leaseholder. (*Id*. at p. 624.) Our high court discounted the significance of the trespass issue and disapproved the jury instruction as a misstatement of the law of self-defense. (*Id*. at pp. 620–621, 624–627.) But no similar charge requiring defendant to have been without fault was given here. We thus reject this claim of error.

## II. Instruction on Motive

Defendant contends the trial court erred in giving the jury the standard instruction on motive. Although he did not raise this contention below, we may review it " 'if the substantial rights of the defendant were affected thereby.' (Pen. Code, § 1259.) ' "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." ' " (*People v. Phea* (2018) 29 Cal.App.5th 583, 608 (*Phea*).) We will therefore consider the merits.

The jury was instructed pursuant to CALCRIM No. 370 as follows: "The People are not required to prove that the defendant had a motive to commit the charged crime. In reaching your verdict you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

This instruction, defendant contends, was inappropriate because it risked lessening the prosecution's burden of proof where the theory of the defense was self-defense, that is, that defendant was motivated by fear of

death or great bodily injury.  He reasons as follows:  First, an element of murder is malice aforethought (§ 187), and self-defense negates malice aforethought.  The prosecution has the burden to prove beyond a reasonable doubt that the defendant did *not* act in self-defense.  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 678.)  Second, self-defense is legal justification for a homicide where the killer acted under the influence of reasonable *fear* alone.  (§ 198.)  Third, fear is one of the recognized motives for which crimes are committed.  (See *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126 [well-recognized motives for crimes are " 'need, avarice, revenge, jealousy, and fear' "].)  Therefore, defendant argues, motive is closely involved in the existence, or lack thereof, of self-defense, and the prosecution's burden to show the absence of one specific motive—fear—carried with it the affirmative duty to prove some *other* motive.

For this final point, defendant relies on *People v. Nguyen* (2015) 61 Cal.4th 1015, in which our high court rejected a defendant's argument that the uncontroverted evidence established self-defense as a matter of law.  On the contrary, the court explained, based on the evidence the jury might have concluded that the defendant engaged in mutual combat because his gang and that of the victim were involved in an ongoing gang war.  (*Id*. at p. 1044.)  Similarly, in *People v. Levitt* (1984) 156 Cal.App.3d 500, 505, 509–510 (disapproved on another point in *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6), the jury might reasonably have found that the defendant did not act solely under the influence of fear in killing two people, in light of the evidence that he had made a clandestine gun purchase and that he had the "classic motive" of jealousy, in that his wife had left him for one of the victims.

Defendant reads too much into *Nguyen* and *Levitt*.  They do not establish that the People must prove a motive other than fear when a defendant claims self-defense, but merely that where the evidence points to a defendant acting for some reason other than fear, the jury's rejection of self-defense will be upheld.  Without showing any motive, the People might defeat a self-defense claim by proving that the circumstances of a killing do not show either that the defendant was actually afraid of death or great bodily injury or that a reasonable person would harbor such a fear under the circumstances.  (See § 198.)  The People could also meet their burden by proving that the defendant used more force than was reasonably necessary to defend against the danger.  (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065.)  Indeed, in his closing argument, the prosecutor stressed that defendant initially shot through the *side* window of the car and that he continued firing, through the back windshield, even after the vehicle had passed him and any purported danger was over.

Defendant suggests that the jurors might have deemed it necessary to have proof of a motive other than fear, and that the instruction on motive would have confused them as to whether that motive must be proved beyond a reasonable doubt.  Viewing the instructions as a whole, as we must (*People v. Mills* (1991) 1 Cal.App.4th 898, 918), we see no likelihood of confusion. " 'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306.)  The jury was instructed that a killing was justified by self-defense if defendant reasonably believed he was in imminent danger of death or great bodily injury, he acted only because of that belief, and he used only necessary force, and that it was the prosecution's burden to show beyond a reasonable doubt that the killing was

not justified. It was also instructed proof of motive was unnecessary. In light of these instructions, any conclusion that the jury might have been confused about the prosecution's burden in disproving self-defense is speculative in the extreme.

We are not persuaded otherwise by defendant's reliance on *People v. Martinez* (1984) 157 Cal.App.3d 660. The defendant in *Martinez* was convicted of selling cocaine, and his defense was entrapment. (*Id*. at p. 662.) The jury was given an instruction on motive similar to that at issue here. (*Id*. at p. 669.) The appellate court concluded the instruction was error, since the defendant never claimed he did not commit the offenses, so an instruction on motive had no application to the facts of the case. (*Ibid*.) And, the court continued, the instruction on motive was prejudicial because its probable effect was "to make the jury erroneously believe that the presence of motive vitiated appellant's claim of entrapment, when in fact the creation of motive by improper police conduct is the very essence of entrapment." (*Id*. at p. 670; see *People v. Vol Villas* (1992) 11 Cal.App.4th 175, 238 [explaining that in *Martinez*, instruction on motive was confusing because "motive was a totally irrelevant issue"].)

Here, we cannot say that the question of motive is similarly irrelevant to the decision the jury had to make. Unlike the situation in *Martinez*, the defense here did not implicitly concede that defendant had a motive to commit a crime. Rather, if defendant acted in justifiable self-defense he committed no crime at all. Defendant does not persuade us it was improper to instruct the jury that the prosecution was not required to prove motive, though the jury could consider the presence or absence of motive in determining whether defendant's actions were unlawful. His substantial rights were therefore not affected by the instruction.

10

## III.    Instruction on Imperfect Self-Defense

Defendant's third claim of instructional error is that the trial court erred in including optional language in the pattern instruction on imperfect self-defense.  Once again, defendant did not raise this objection at trial, but we will consider the question on the merits to determine whether his substantial rights were affected.  (See *Phea*, *supra*, 29 Cal.App.5th at p. 608.)

The jury was instructed pursuant to CALCRIM No. 571 that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in *imperfect self-defense*.  [¶]  If you conclude the defendant acted in *complete self-defense*, his action was lawful and you must find him not guilty of any crime.  [¶]  The difference between *complete self-defense* and *imperfect self-defense* depends on whether the defendant's belief in the need to use deadly force was reasonable.  [¶]  The defendant acted in imperfect self-defense if:  [¶] 1.  The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; AND  [¶] 2.  The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; BUT  [¶] 3.  At least one of those beliefs was unreasonable."

The instruction also included the following optional language: "*Imperfect self-defense* does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversar[y's] use of force."  This is the language defendant challenges.  His challenge is on the ground that the optional provision is appropriate only where there is evidence a defendant's behavior was predicated on a mistake of *law* regarding the legal contours of self-defense, and there is no evidence of a mistake of law here.

11

For this point, defendant relies on *In re Christian S.* (1994) 7 Cal.4th 768 (*Christian S.*). The question there was whether statutory amendments that eliminated the defense of diminished capacity similarly abrogated the defense of imperfect self-defense. (*Id.* at p. 771.) In the course of answering that question in the negative, our high court explained that an honest belief in imminent peril negates the malice element necessary for murder rather than manslaughter, even if that belief was unreasonable. (*Id.* at p. 773.) In a footnote, the court observed that ordinary self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Ibid.*, fn. 1.) The court then went on: "It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Ibid.*)

Nothing in the face of this text suggests the rule is limited to a defendant who has made a mistake of *law* regarding the right to self-defense. Defendant purports to find such a limitation implied in another footnote in *Christian S.*, in which the court disavowed any suggestion "that malice would be negated by a mistake of law, for example, if a defendant killed with the mistaken belief that he could properly use deadly force to protect his parked automobile against a vandal." (*Christian S., supra*, 7 Cal.4th at p. 779, fn. 3.) But such a mistake of law is unrelated to the point made in the earlier footnote—that imperfect self-defense may not be invoked by one who created the need for perceived self-defense by his or her own wrongful conduct.

12

In fact, cases decided by our high court have routinely applied this principle in situations analogous to that before us now. For instance, in *People v. Valencia* (2008) 43 Cal.4th 268, 288, the court set forth the rule that imperfect self-defense cannot be invoked when a defendant, through wrongful conduct, creates the circumstances that justify the adversary's attack, and gave the following example: "[I]f defendant had first assaulted [the victim], then unreasonably believed [the victim] was assaulting him, a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable." Citing *Valencia*, the court in *People v. Enraca* (2012) 53 Cal.4th 735, 761–762, concluded the instruction was supported by evidence that the defendant attacked a victim, allegedly became fearful that the victim was about to shoot him, then shot and killed the victim. Similarly, in *People v. Rangel* (2016) 62 Cal.4th 1192, 1226, the court explained that unreasonable self-defense was unavailable to the defendant, who broke into a home while the victim and his family were present, then shot the victim because the defendant thought he was running to get a gun.

We see no basis in the law for the limitation defendant proposes on the use of the instruction. And the evidence that defendant approached Chadly and Johnston to confront them with a gun in his hand provides a sufficient basis to give the instruction to the jury. Defendant has not shown the instruction affected his substantial rights.[2]

---

[2] Because we find no error in the instructions, we necessarily reject defendant's claim of cumulative prejudice from the claimed errors.

13

## IV. Issues Regarding Sentencing

### A. Background

The trial court sentenced defendant to an aggregate term of 55 years to life in prison. It first imposed a term of 15 years to life for second degree murder, then added a 25-year-to life enhancement under section 12022.53, subdivision (d), finding it would not be in the interest of justice to dismiss or stay the enhancement. For count 3, shooting at an occupied motor vehicle, the court imposed the midterm of five years (§ 246), stating as it did so that under recent legislation it could not impose the upper term.

As to the 25-years-to-life enhancement under section 12022.53, subdivision (d) in connection with count 3, the trial court stated that under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), it could impose a lesser enhancement under subdivisions (b) or (c) of the statute, and that it was in fact required to do so to avoid the sentence exceeding 20 years. The court therefore imposed a 10-year enhancement to count 3 under section 12022.53, subdivision (b).

The court ordered all terms to run consecutively, for a determinate term of 15 years and an indeterminate term of 40 years to life.

### B. Unauthorized 10-Year Enhancement

Defendant makes a number of challenges to this sentence. But before addressing them, we consider an error in defendant's favor that led to an unauthorized sentence, an error defendant acknowledges. That is, the trial court was incorrect when it stated that *Tirado* authorized it to impose a lesser enhancement under section 12022.53. That statute provides that, "[n]otwithstanding any other law, a person who, in the commission of a felony specified in [section 12022.53,] subdivision (a) [or] [s]ection 246 . . . personally and intentionally discharges a firearm and proximately causes great bodily

14

injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)

Subdivisions (b) and (c) of section 12022.53 authorize enhancements of 10 or 20 years respectively for one who "in the commission of a felony specified in subdivision (a)," personally uses or intentionally discharges a firearm. (§ 12022.53, subds. (b) & (c).) Our high court in *Tirado* held that where a jury finds true the facts supporting an enhancement under subdivision (d) of section 12022.53, and the trial court determines the enhancement should be stricken or dismissed in the interest of justice pursuant to section 1385 (§ 12022.53, subd. (h)), the court may impose an enhancement under section 12022.53, subdivision (b) or (c). (*Tirado*, *supra*, 12 Cal.5th at p. 700.) However, the court went on to explain in a footnote, this general rule does not apply to a charge under section 246, because that offense is not " 'specified in subdivision (a),' as required for imposition of an enhancement of section 12022.53[, subds. ](b) or (c)." (*Tirado*, at p. 700, fn. 12.)

The trial court here was therefore not authorized to impose the 10-year enhancement under section 12022.53, subdivision (b) for count 3, the violation of section 246. Rather, in connection with this count, it had two choices: it could impose the 25-year-to-life enhancement under subdivision (d), or it could strike or dismiss the enhancement in the interest of justice. (§ 12022.53, subd. (h).)

The parties agree that the 10-year to life enhancement term was unauthorized, but they disagree on the remedy. Defendant urges us to remand the matter for a full resentencing, citing the general rule that "when part of a sentence is stricken on review, on remand for resentencing 'a full

resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893 (*Buycks*); accord, *People v. Navarro* (2007) 40 Cal.4th 668, 681; *People v. Butler* (2023) 89 Cal.App.5th 953, 962, review granted May 31, 2023, S279633; see *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 927.) The Attorney General, on the other hand, urges us to remand for only the limited purpose of correcting the unauthorized term. For this remedy, he points us to *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 442, which concluded a trial court did not abuse its discretion in failing to carry out a full resentencing after a limited remand to correct an unauthorized sentence.

In the circumstances before us, we think it appropriate to remand for a full resentencing. The difference between the 10-year enhancement the trial court mistakenly imposed and either of the choices properly available to it—either striking the enhancement or imposing a 25-year-to-life enhancement—is significant and creates " 'changed circumstances' " (*Buycks*, *supra*, 5 Cal.5th at p. 893) that might guide its other discretionary choices and that warrant a full resentencing. At that time, the trial court may revisit all the discretionary decisions it made in sentencing defendant on the crimes of which he was convicted, applying the correct legal standards. (See *People v. Jones* (2022) 79 Cal.App.5th 37, 46 [ordering full resentencing on remand in light of " ' "interlocking nature" ' and 'inherently integrated nature' of felony sentencing for a multiple-count conviction"].)

Because we are remanding for a full resentencing, we need not linger over defendant's remaining challenges to his sentence. Defendant argues,

and the Attorney General does not dispute, that the trial court had discretion to choose whether to impose concurrent, rather than consecutive, sentences for murder and shooting at an occupied vehicle. The only dispute between the parties is whether the trial court understood it had this discretion. Regardless, on remand the trial court will decide anew whether to impose consecutive or concurrent sentences.

Defendant also argues the trial court misconstrued the scope of its discretion to dismiss enhancements under section 1385. However, the trial court need not consider the mitigating factors in section 1385, subdivision (c)(2) if, as occurred here, it finds that dismissal of an enhancement would endanger public safety. (See, e.g., *People v. Mazur* (2023) 97 Cal.App.5th 438, 444, review granted Feb. 14, 2024, S283229 (*Mazur*); *People v. Mendoza* (2023) 88 Cal.App.5th 287, 297 (*Mendoza*); *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–241, review granted Apr. 19, 2023, S278786 (*Anderson*); *People v. Walker* (2022) 86 Cal.App.5th 386, 396–399, review granted Mar. 22, 2023, S278309 (*Walker*); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 17–21 (*Lipscomb*).) On remand, defendant may argue anew that certain section 1385, subdivision (c)(2) factors apply and that dismissal of one or more enhancements would not endanger public safety.

## V. Racial Justice Act

### A. The RJA

Defendant also argues the trial court violated the RJA, which became effective January 1, 2021. (§ 745, added by Stats. 2020, ch. 317, § 3.5.) This statute was enacted with the laudatory purpose " 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' " (*People v. Coleman* (2024) 98 Cal.App.5th 709, 719.) To this end, the RJA provides that

17

the state may not "seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) Among the acts that constitute a violation of the RJA are that "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin"; "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful, . . . [unless] the person speaking is giving a racially neutral and unbiased physical description of the suspect"; and "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed." (§ 745, subds. (a)(1), (2), & (4)(A).)

A defendant who claims a violation of the RJA "may file a motion pursuant to [section 745], or a petition for writ of habeas corpus . . . . For claims based on the trial record, a defendant may raise a claim alleging a violation of [section 745,] subdivision (a) on direct appeal from the conviction or sentence. . . . If the motion is based in whole or in part on conduct or statements by the judge, the judge shall disqualify themselves from any further proceedings under [the RJA]." (§ 745, subd. (b).) If the defendant

18

files a motion in the trial court and makes a prima facie showing of a violation, the court must hold a hearing at which evidence may be presented, including statistical evidence, aggregate data, and testimony, including expert testimony. (§ 745, subd. (c).)

If a violation of the RJA is found after judgment has been entered, various remedies are available. Among them, if a *conviction* was sought or obtained in violation of section 745, subdivision (a), the court must vacate the conviction and sentence and order new proceedings. (§ 745, subd. (e)(2)(A).) But if only a *sentence* was sought, obtained, or imposed in violation of subdivision (a), the court vacates the sentence and imposes a new sentence no greater than that previously imposed. (§ 745, subd. (e)(2)(B).)

## B. Additional Background

In his sentencing memorandum, defendant asked the trial court to strike the firearm enhancements because their imposition would result in a discriminatory racial impact in violation of section 1385, subdivision (c)(2)(A) and the RJA. He described himself, as "a multiracial man, of Brazilian heritage," and "Black, White, and Latino," and he pointed to a report indicating that Black people and Latinos in Alameda County were more likely than white people to be incarcerated. At the sentencing hearing, defendant reiterated this theme, and he complained that the probation officer's report had mistakenly referred to him as white rather than Latino or mixed race, arguing that both the probation officer and the prosecutor were seeking to diminish defendant's identification as a person of color.

The trial court rejected this argument. In doing so, it first noted, in apparent reference to defendant's complaint that the probation officer identified him as white, that defendant's first language, Portuguese, is a European language, and that defendant's physical appearance was consistent

19

with being white.  It then discussed the standards for dismissing enhancements under section 1385, and said, "The question we need to do is make a connection between what your three arguments are and this crime. Is there a—does his being Brazilian got something to do with this crime?  Is it a contributing factor to this crime?  There has to be a contributing factor. Now, a contributing factor is in [Penal Code] section 1170[, subdivision] (b)(6), it has to have a contributing factor, some connection.  [¶]  Ours is a country of immigrants.  Because the—you're an immigrant, do you get a pass on a gun use because you're an immigrant?  I think the law applies to everybody, no matter who they are. . . .  [¶]  I don't see any evidence in this case, in the trial of the case, in the presentation of the evidence, in the arguments of counsel, in any notes we got from the jury, I don't see any evidence that racial issues were an issue in this case."

The court went on to reject defendant's other arguments that the enhancements should be stricken—because of the length of the resulting sentence and his mental health and childhood trauma—finding it would not be in the furtherance of justice to dismiss the enhancements.  The court then observed that the crime took place in defendant's own neighborhood and that defendant endangered his neighbors, and followed up with this comment: "Bullets will go through walls and kill people.  Happens in Oakland everyday. Doesn't ever happen in Fremont, so—unless Mr. Kelling's around, then it could happen then.  So a person who has that kind of disregard for his own neighborhood, and people in his town, his community, that's the kind of disregard that this law is created for."

### C. Analysis

Defendant contends that the trial court's ruling fell afoul of the RJA in two respects.  First, he argues that the trial court's comments show that it

20

misunderstood the standards that apply to a claim that application of an enhancement would result in a discriminatory racial impact as described in section 745, subdivision (a)(4). (§ 1385, subd. (c)(2)(A).) Under that provision, the RJA is violated if a defendant receives a longer or more severe sentence "than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed." (§ 745, subd. (a)(4).) Defendant contends the court's comments indicate that, when deciding whether to strike enhancements under section 1385, subdivision (c)(2)(A), it mistakenly applied the sentencing standards of a *different* statute—section 1170, subdivision (b)(6), which provides for imposition of the lower term where one of several factors contributed to the commission of the offense.

We agree with defendant that the application of section 1385, subdivision (c)(2)(A) does not depend on a showing that race, ethnicity, or national origin contributed in any way to the commission of a crime. We also agree that some of the trial court's comments suggest it thought otherwise. But we need not address this point further, as the case must be remanded for resentencing because of an unrelated error in the court's imposition of a firearms enhancement. Nothing we say prevents defendant from urging on remand that any of the section 1385 factors are satisfied and that their application would not threaten public safety.

Defendant argues, second, that the trial court's comments reflect racial bias and require reversal of the entire judgment, or at least of the sentence. Specifically, he contends the trial court treated his crimes as more serious

21

because they took place in Fremont, where such events "[don't] ever happen . . . unless [defendant's] around," rather than in Oakland, where these things "happen[] . . . everyday." Defendant argues that, by referring to Oakland, which he describes as "not only a high crime city compared with Fremont, but also [with] a high concentration of African Americans compared with the more suburban Fremont," and by using words that suggested he "import[ed] . . . Oakland standards into his hometown," the trial court made a veiled racial reference in violation of the RJA. Defendant also complains that the trial court made its comments when defendant's racial and ethnic characteristics were at the front of its mind, as it had already rejected his complaint that the probation officer's presentence report wrongly characterized him as white.

We need not decide in the first instance whether the trial judge's comments showed a violation of the RJA or, if they did, whether the proper remedy would be to vacate the convictions or only the sentence. (See § 745, subd. (e)(2).) The Legislature has provided a procedure for a defendant to challenge an alleged RJA violation by filing a motion in the trial court. (§ 745, subd. (b).) As we are remanding this matter for resentencing, defendant may raise his RJA challenges there at that time. And if an RJA violation is found, the parties agree defendant may properly seek any of the remedies contemplated by the statute. (§ 745, subd. (e)(2).)[3]

---

[3] The respondent's brief points out that defendant did not raise in the trial court the precise issue he raises on appeal, and urges us to treat the RJA claim as forfeited. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 810-817 [RJA claims are subject to general rules of forfeiture].) We elect not to rely on forfeiture in this case. We are mindful that our Legislature has authorized a procedure for a defendant to raise claims under the RJA for the first time during the pendency of an appeal, by moving for a stay of the appeal and a remand to the trial court. (§ 745, subd. (b).) Such a stay is not

## VI.    Assignment to Different Judge on Remand

Defendant asks us to order the proceedings on remand to be heard by a different judge.

Section 170.1, subdivision (c) of the Code of Civil Procedure provides that, at a party's request or on its own motion, "an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."  We exercise our power to disqualify a judge under this provision " 'sparingly and only where the interests of justice require it.' " (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1256; see *People v. Landau* (2011) 199 Cal.App.4th 31, 40.) Actual bias is not necessary; rather, disqualification might properly occur, for instance, "where a reasonable person might doubt whether the trial judge was impartial [citation], or where the court's rulings suggest the 'whimsical disregard' of a statutory scheme" (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303), or "when the record shows the trial judge became embroiled or personally invested in the outcome of the proceeding" (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1079).  But "[m]ere judicial error does not establish bias and normally is not a proper ground for disqualification." (*LaBlanc,* at p. 1079.)

Defendant asks us to exercise our power to disqualify the trial judge for two reasons.  First, he asserts the judge showed hostility to the broadening of

_____

necessary here because we are remanding the matter to the trial court for resentencing on another ground, and defendant may then avail himself of the ordinary procedures for raising an RJA claim in the trial court.  At oral argument, the Attorney General agreed that if the trial court found a violation of the RJA, the full range of remedies would remain available, notwithstanding our decision today affirming defendant's conviction.

section 1385's standards for dismissing enhancements effected by then-recent Senate Bill No. 81 (Stats. 2021, ch. 721, § 1, eff. Jan. 1, 2022). Amended section 1385 requires a trial court, when it exercises its discretion to dismiss an enhancement, to "consider and afford great weight" to evidence that certain mitigating factors are present; factors include that application of the enhancement would result in a discriminatory racial impact under the RJA, that multiple enhancements are alleged in a single case, and that an enhancement could result in a sentence of more than 20 years. (§ 1385, subd. (c).)

During the February 10, 2022 sentencing hearing, the trial court noted that section 1385, subdivision (c), now "[h]as lots of indefiniteness to it, not a lot of guidance for a court, other than to say don't impose long sentences, ironically, in a code that says you're supposed to impose long sentences to people that use a gun like this. So it creates a conundrum." After counsel presented further argument, the trial court noted that this was the first case that it had occasion to apply the new law, and it complimented defense counsel on advocating to have the sentencing hearing delayed until after the amendments went into effect so defendant could receive their benefit. The court went on to make comments that defendant asserts show its disapproval of the new law. In particular, the court said that it must consider the interest of society in exercising its discretion. In this context, it said this factor is "not a one-way street," and some of the new statutory language "seemed like it's set up as a one-way street to benefit one side and not the other." The court went on to explain that defendant committed the crimes "in his own neighborhood where his dad lives and he lives," that defendant had no remorse and did not accept responsibility for his actions, and that "every

24

person who has a run-in with him could be in trouble," leading the court to conclude that dismissal of the enhancements would endanger public safety.

The trial court's statements about the amendments to section 1385, defendant argues, show the trial court was hostile to the new sentencing standard because it does not set the People's interests on an equal footing with those of defendant. We disagree. The trial court's comments merely point out the tension between the statutory provisions for lengthy enhancements for use of a firearm during a felony (see, e.g., § 12022.53, subd. (d)) on the one hand, and on the other hand the new provision of section 1385, subdivision (c) that, when exercising its discretion regarding dismissal of enhancements, one of the factors that supports dismissal is that application of an enhancement could result in a sentence of over 20 years. The trial court's musings do not show hostility to the law. And in fact, multiple appellate courts have wrestled with the question of whether a trial court retains discretion to consider public safety in exercising its discretion under the amendments to section 1385, subdivision (c), and they have uniformly concluded that it may do so—as the trial court properly did. (See *Mazur*, *supra*, 97 Cal.App.5th at p. 444; *Mendoza*, *supra*, 88 Cal.App.5th at p. 297; *Anderson*, *supra*, 88 Cal.App.5th at pp. 238–241; *Walker*, *supra*, 86 Cal.App.5th at pp. 396–399; *Lipscomb*, *supra*, 87 Cal.App.5th at pp. 17–21.)

Defendant further argues that a different judge should preside over further proceedings because some of the sentencing court's comments—in particular, its statements about the crimes taking place in defendant's own neighborhood, rather than in Oakland—indicate the court was reaching for an "arbitrary rationalization for finding that public safety outweighed all the other factors in favor of an exercise of section 1385 leniency." We are not persuaded that the court's comments show hostility to the changes effected

25

by Senate Bill No. 81, rather than reflecting its view of the callousness of defendant's actions and his disregard for others' safety, and accordingly do not order disqualification under Code of Civil Procedure section 170.1, subdivision (c). However, to the extent defendant's arguments implicate the RJA itself, he may raise them in a motion on remand, over which a different judge will preside. (§ 745, subd. (b).)

## DISPOSITION

The judgment with respect to conviction is affirmed, subject to any motion under the RJA defendant may bring on remand. The 10-year enhancement under section 12022.53, subdivision (b) is stricken. The matter is remanded for further proceedings consistent with the views expressed in this opinion.


TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Kelling* (A164556)